# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

Thomas E. Underwood and Donald E. Lee, individually
and on behalf of all others similarly situated,

      Plaintiff,

v.

Carpenters Pension Trust Fund - Detroit
and Vicinity Pension Plan ("Plan") and
Trustees of the Plan,

    Defendants.

Case No. 2:13-cv-14464
Hon. Laurie J. Michelson

**CLASS ACTION**

---

| | |
|---|---|
| Eva T. Cantarella (P51917) | Edward J. Pasternak (P58766) |
| Bradley J. Schram (P26337) | John I. Tesija (P36709) |
| Robert P. Geller (P34391) | Novara Tesija PLLC |
| Hertz Schram PC | 2000 Town Center, Ste. 2370 |
| 1760 S. Telegraph Rd., Ste. 300 | Southfield, MI 48075 |
| Bloomfield Hills, MI 48302 | o. 248-354-0380; f. 248-354-0393 |
| o. 248-335-5000; f. 248-3353346 | ejp@novaratesija.com |
| ecantarella@hertzschram.com | tesija@novaratesija.com |
| *Attorneys for Class* | *Attorneys for Defendants* |

---

## MOTION FOR COMMON FUND ATTORNEYS' FEES, COSTS AND EXPENSES, AND INCENTIVE AWARDS TO THE NAMED PLAINTIFFS
### [brief in support attached]
*oral argument requested*

Pursuant to Fed. R. Civ. P. 54(d)(2)(B), the Stipulated Order this Court entered

on November 6, 2014 (doc 44), the proposed Settlement Agreement, and the proposed

Notice to the Class of the proposed Settlement ("Class Notice"), Class Counsel files

this Motion for Common Fund Attorneys' Fees, Costs and Expenses, and Incentive

Awards to the Named Plaintiffs.  The reasons in support of this Motion are set forth

in the attached brief.

On October 11, 2016, the undersigned attorney for the Class contacted the

undersigned attorney for Defendants to inform him that she would soon be filing the

instant motion and to request Defendants' concurrence in the relief requested.

Defendants' attorney responded that, although Defendants would not concur in the

relief requested, they also would not oppose the motion.

Respectfully Submitted November 3, 2016

/s/ Eva T. Cantarella
Eva T. Cantarella (P519171)
Bradley J. Schram (P26337)
Robert P. Geller (P34391)
Hertz Schram PC
1760 S. Telegraph Rd., Ste. 300
Bloomfield Hills, MI 48302
o. 248-335-5000; f. 248-335-3346
ecantarella@hertzschram.com
*Attorneys for Plaintiff Thomas E. Underwood
and all others similarly situated*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

Thomas E. Underwood and Donald E. Lee, individually
and on behalf of all others similarly situated,

      Plaintiff,

v.

                                 Case No. 2:13-cv-14464
                                 Hon. Laurie J. Michelson

Carpenters Pension Trust Fund - Detroit
and Vicinity Pension Plan ("Plan") and
Trustees of the Plan,

Defendants.                              **CLASS ACTION**

---

| | |
|---|---|
| Eva T. Cantarella (P51917) | Edward J. Pasternak (P58766) |
| Bradley J. Schram (P26337) | John I. Tesija (P36709) |
| Robert P. Geller (P34391) | Novara Tesija PLLC |
| Hertz Schram PC | 2000 Town Center, Ste. 2370 |
| 1760 S. Telegraph Rd., Ste. 300 | Southfield, MI 48075 |
| Bloomfield Hills, MI 48302 | o. 248-354-0380; f. 248-354-0393 |
| o. 248-335-5000; f. 248-3353346 | ejp@novaratesija.com |
| ecantarella@hertzschram.com | tesija@novaratesija.com |
| *Attorneys for Plaintiff* | *Attorneys for Defendants* |

---

# BRIEF IN SUPPORT OF
# MOTION FOR COMMON FUND ATTORNEYS' FEES, COSTS AND
# EXPENSES, AND INCENTIVE AWARDS TO THE NAMED PLAINTIFFS
*oral argument requested*

## <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.   PREFATORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  HISTORY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Pre Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Post Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.   Post Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.   Post Restatement Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E.   Post Final Judgment Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . 10

    F.   Settlement Discussions During Pendency of Appeal . . . . . . . . . . . 11

    G.   Other Time and Effort by Class Counsel . . . . . . . . . . . . . . . . . . . . 13

III. CLASS COUNSEL ARE ENTITLED TO ATTORNEYS' FEES
    FROM THE COMMON FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.   The Common Fund Exception to the American Rule . . . . . . . . . . . 16

    B.   In the Sixth Circuit, the District Court May Award Common
        Fund Fees Using an Enhanced Lodestar Method or the
        Percentage of the Fund Method, But the Trend Is the
        Percentage Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.   Percentage cases in this Circuit . . . . . . . . . . . . . . . . . . . . . . 19

        2.   Lodestar cases in this Circuit . . . . . . . . . . . . . . . . . . . . . . . . 22

        3.   The reasonable common fund fee here . . . . . . . . . . . . . . . . . 27

            1st <u>Ramey</u> factor: value of the benefits rendered to the Class   28

2nd Ramey factor: value of the services on an hourly basis . . 30

3rd Ramey factor: whether the services were undertaken
on a contingent fee basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

4th Ramey factor: society's stake in rewarding attorneys
who produce such benefits . . . . . . . . . . . . . . . . . . . . . . . . . . 32

5th Ramey factor: the complexity of the litigation . . . . . . . . 32

6th Ramey factor: the professional standing and skill of
counsel on both sides . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    4.    Related costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV.    Underwood and Lee Are Entitled to Incentive Awards . . . . . . . . . . . . . . . 42

    A.    Proposed Incentive Award for Underwood: $15,000 . . . . . . . . . . . 45

    B.    Proposed Incentive Award for Lee: $7,500 . . . . . . . . . . . . . . . . . . . 47

V.    CONCLUSION AND RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

# INDEX OF AUTHORITIES

**Cases**

Allan v. Realcomp II, Ltd.
No. 10-cv-14046, 2014 U.S. Dist. LEXIS 185994 (E.D. Mich. Sept. 4, 2014) . . 44

Bailey v. AK Steel Corp.
No. 1:06-cv-468, 2008 U.S. Dist. LEXIS 18838 (S.D. Ohio 2008) . . . . . . . . . . . 23

Basile v. Merrill Lynch, Pierce, Fenner & Smith
640 F. Supp. 697 (S.D. Ohio 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Blum v. Stenson,
465 U.S. 886, 104 S. Ct. 1541, 79 L. Ed 2d 891 (1984) . . . . . . . . . . . . . . . . . 16, 17

Boeing Co. v. Van Gemert,
444 U.S. 472, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980) . . . . . . . . . . . . . . . . . 16-17

Bowling v. Pfizer, Inc.,
102 F.3d 777 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 41

Brotherton v. Cleveland
141 F. Supp. 2d 907 (S.D. Ohio 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Caffey v. Unum Life Ins. Co.
302 F.3d 576 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Chambers v. Nasco, Inc.,
501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) . . . . . . . . . . . . . . . . . . . 16

City of Plantation Police Officers' Emples. Ret. Sys. v. Jeffries
2:14-cv-1380, 2014 U.S. Dist. LEXIS 178280 (S.D. Ohio Dec. 29, 2014) . . . . . 23

Clevenger v. Dillards, Inc.,
No. C-1-02-558, 2007 U.S. Dist. LEXIS 17464
(S.D. Ohio Mar. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25, 30, 31

Coughlan v. Sprint Communs. Co. L.P.,
No. 11-11563, 2012 U.S. Dist. LEXIS 163197 (E.D. Mich. Nov. 15, 2012) . . . . 21

Denney v. Phillips & Buttoroff Corp.,
331 F.2d 249 (6th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Enterprise Energy Corp. v. Columbia Gas Transmission Corp.
137 F.R.D. 240 (S.D. Ohio 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Franklin v. Midland Funding, LLC
No. 3:10-cv-91, 2011 U.S. Dist. LEXIS 89919 (W.D. Ohio Aug. 12, 2011) . . . . 44

Great-West Life & Annuity Ins. Co. v. Knudson
534 U.S. 204; 122 S. Ct. 708 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Griffin v. Flagstar Bancorp, Inc.,
No. 2:10-cv-10610, 2013 U.S. Dist. LEXIS 173702
(E.D. Mich. Dec. 2, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25, 41, 43

Hadix v. Johnson
322 F.3d 895 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Halaburda v. Bauer Publ. Co., LP
No. 2:12-cv-12831, 2015 U.S. Dist. LEXIS 709 (E.D. Mich. Jan. 6, 2015) . . . . 43

Humphrey v. United Way,
No. 05-0758, 2007 U.S. Dist. LEXIS 59557 (S.D. Tex. Aug. 14, 2007) . . . . 37-38

In re Beverly Hills Fire Litig.
639 F. Supp. 915 (E.D. Ky. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

In re Broadwing, Inc. ERISA Litig.,
252 F.R.D. 369 (S.D. Ohio 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 41, 43

In re Cardinal Health Inc. Sec. Litigs.,
528 F. Supp. 2d 752 (S.D. Ohio 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

In re CMS Energy ERISA Litig.,
No. 02-72834, 2006 U.S. Dist. LEXIS 55836
(E.D. Mich. June 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25, 41, 43

In re Delphi Corp. Secs., Derivatives & "ERISA" Litig.,
248 F.R.D. 483 (E.D. Mich. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 43

In re DPL Inc. Sec. Litig.,
307 F. Supp. 2d 947 (S.D. Ohio Mar. 8, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

In re F&M Distribs., Inc. Sec. Litig.
No. 95-cv-71778, 1999 U.S. Dist. LEXIS 11090 (E.D. Mich. 1999) . . . . . . . . . . 44

In re Kmart Corp. Sec. Litig.,
No. 95-CV-75584, 1998 U.S. Dist. LEXIS 23092 (E.D. Mich. Oct. 30, 1998) . . 22

In re Prandin Direct Purchaser Antitrust Litig.
No. 2:10-cv-12141, 2015 U.S. Dist. LEXIS 5964 (E.D. Mich. Jan. 20, 2015)  . . 23

In re Revco Sec. Litig.
No. 89-cv-593, 1992 U.S. Dist. LEXIS 7852 (N.D. Ohio 1992)  . . . . . . . . . . . . . 23

In re Rio Hair Naturalizer Prods. Liab. Litig.,
MDL No. 1055, 1996 U.S. Dist. LEXIS 20440 (E.D. Mich. Dec. 20, 1996) . . . . 22

In re Skelaxin (Metaxalone) Antitrust Litig.
No. 2:12-cv-83, MDL No. 2343, 2014 U.S. Dist. LEXIS 9166
(E.D. Tenn. June 30, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

In re Visteon Corp. ERISA Litig.,
No. 05-71205, 2007 U.S. Dist. LEXIS 96023
(E.D. Mich. Mar. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25, 41

Johnson v. Midwest Logistics Sys.,
No. 2:11-cv-1061, 2013 U.S. Dist. LEXIS 74201 (S.D. Ohio May 24, 2013) . . . 21

Kogan v. AIMCO Fox Chase, L.P.,
No. 98-cv-73230, 193 F.R.D. 496 (E.D. Mich. May 30, 2000)  . . . . . . . . . . . . . . 22

Lowther v. AK Steel Corp.
No. 1:11-cv-877, 2012 U.S. Dist. LEXIS 181476 (S.D. Ohio Dec. 21, 2012)  . . 23

Manners v. American General Life Ins. Co.
No. 3-98-0266, 1999 U.S. Dist. LEXIS 22880 (M.D. Tenn. Aug. 10, 1999)  . . . 23

Merkner v. AK Steel Corp.
 NO. 1:09-CV-423, 2011 U.S. Dist. LEXIS 157375 (S.D. Ohio Jan. 10, 2011)  . 23

Montanile v. Bd of Trs. of the Nat'l Elevator Indus. Health Plan
136 S. Ct. 651; 193 L. Ed. 2d 556 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Moulton v. U.S. Steel Corp.
581 F.3d 344 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

New Eng. Health Care Emples. Pension Fund v. Fruit of the Loom,
234 F.R.D. 627 (W.D. Ky 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 41

Ramey v. Cincinatti Enquirer, Inc.,
508 F.2d 1188 (6th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 28-32, 36

Rawlings v. Prudential-Bach Properties, Inc.,
9 F.3d 513 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 23, 24

Rotuna v. West Customer Mgmt. Group, LLC,
No. 4:09-cv-1608, 2010 U.S. Dist. LEXIS 58912 (N.D. Ohio, June 15, 2010) . . 22

Schumacher v. AK Steel Corp. Ret. Accum. Pension Plan,
995 F. Supp. 2d 835 (S.D. Ohio 2014) . . . . . . . . . . . . . . . . . . . . . . . 20, 25, 30, 31

Shane Group, Inc. v. Blue Cross Blue Shield of Mich.
No. 10-cv-14360, 2015 U.S. Dist. LEXIS 41968 (E.D. Mich. 2015) . . . . . . . . . . 44

Shanehchian v. Macy's, Inc., No. 1:07-cv-00828
2013 U.S. Dist. Ct. Motions LEXIS 35167 (W.D. Ohio Feb. 28, 2013) . . . . 20, 43

Stanley v. United States Steel Co.,
No. 04-74654, 2009 U.S. Dist. LEXIS 114065 (E.D. Mich. Dec. 8, 2009) . . . . . 22

Swigart v. Fifth Third Bank,
No. 1:11-cv-88, 2014 U.S. Dist. LEXIS 94450 (S.D. Ohio July 11, 2014) . . . . . 21

Whitlock v. FSL Mgmt., LLC
No. 3:10-cv-00562, 2016 U.S. Dist. LEXIS 170516 (W.D. Ky Dec. 22, 2015) . 43

Worthington v. CDW Corp.
No. C-1-03-649, 2006 U.S. Dist. LEXIS 32100
(S.D. Ohio May 22, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 44

Yost v. First Horizon Nat'l Corp.
No. 2:08-02293, 2012 U.S. Dist. LEXIS 191009
(W.D. Tenn. Sept. 13, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Statutes**

26 U.S.C. §432(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

29 U.S.C. §1085(e) [ERISA §305(e)] . . . . . . . . . . . . . . . . . . . . . 2, 14-16, 33, 34

29 U.S.C. §1132(a)(3) [ERISA §502(a)(3)]] . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 U.S.C. §1132(g)(1) [ERISA §502(g)(1)] . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

**Treasury Regulations**

26 CFR 1.432(e)(9)-1(d)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Treasury Decision 9765
T.D. 9765, 2016 IRB LEXIS 301, 2016-20 I.R.B. 813 (I.R.S. 2016) . . . . . . . . . 15

**Public Laws**

Multiemployer Pension Reform Act of 2014
        Division O of the Consolidated and Further Continuing Appropriations
        Act, Public Law No. 113-235 (128 Stat. 2130 (2014). . . . . . . . . . . . . . . . . 14

Pension Protection Act of 2006, PL 109-280 . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

**Court Rules**
Fed. R. Civ. P. 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Miscellaneous**
4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions
§14:6 (4th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

## I.     PREFATORY STATEMENT

Fed. R. Civ. P. 54(d)(2)(B) states that, "[u]nless provided by statute or order of the court," a motion for attorneys' fees must be filed no later than fourteen days after entry of a "judgment."  On November 6, 2014, the Court entered a Stipulated Order that permitted Class Counsel to file "a motion for common fund fees and related expenses within 45 days _after_ all damages issues and liability issues have been resolved by stipulation of the parties, settlement, or decision on appeal, unless the Court enters an Order requiring Class Counsel to file such Motion at an earlier or later date" (doc 44)  The Court has not entered such "earlier or later date" Order.

## II.    HISTORY OF THE CASE[1]

### A.     Pre Complaint

This case has a long and tortured history pre-dating the filing of the Complaint, much of which is noted in the Time Records (PX1) recorded by the undersigned attorney for the Class (Cantarella) and other Class Counsel who worked on this case. Activities commenced in June of 2013 when Cantarella began receiving telephone calls from disabled Participants in the Plan, advising that they had received a Notice informing them that (i) their Disability Retirement Benefits ("DRB") under §5.1 of

---

[1] Although the Court is familiar with the history of this case, plaintiffs review that history now in order to emphasize the amount of time and effort expended by Class Counsel to bring this litigation to a successful conclusion.  While the Court may, of course, elect to skip forward to Part III of this brief, **there is new information in Part II. G. of this brief Class Counsel believes the Court should consider**.

the Plan would be drastically reduced pursuant to a Plan amendment (the "Thirteenth Amendment"), effective August 1, 2013, and (ii) under the Amendment, if they did not obtain a Social Security Disability Income ("SSDI") award within one year (i.e., by August 1, 2014), their DRB would be eliminated altogether.  See Time Records (PX1) (documenting these calls); and Cantarella Affidavit (PX2).[2]  The callers sought Cantarella's assistance in preventing the planned reduction to their DRB and recovering any DRB benefits that might be withheld in the future.  Id.

In response to these telephone calls and requests for assistance, Cantarella commenced an investigation of a possible claim, which included (i) locating and obtaining copies of the governing Plan instruments, various Notices the Trustees issued to Participants concerning the Plan, and the Plan's annual financial reports; and (ii) researching ERISA §305, the statute purportedly requiring the DRB reductions.  Time Records (PX1); and Cantarella Affidavit (PX2).  Cantarella also interviewed each caller to (i) ascertain the amount of their DRB reduction under the Thirteenth Amendment, obtain their contact information, and glean any other information that might be helpful in pursuing a claim to restore the original DRB and recover any benefits wrongfully withheld; and (ii) determine who might be suitable to represent these callers if the potential claim were eventually filed as a class action.

---

[2] To the extent not specifically noted in the Time Records or documented via another Exhibit to this brief such as Cantarella's Affidavit, Cantarella, by her e-signature below, attests to all facts asserted in this Part II.

Id.

During these interviews, Cantarella took copious notes, created a spreadsheet with all of the pertinent information on each caller, and created an email list to facilitate future communications. Time Records (PX1); Cantarella Affidavit (PX2). One of the callers, Tom Underwood, was particularly helpful in identifying and obtaining Plan documents and pertinent Notices to Participants about the Plan. Therefore, Cantarella inquired of Underwood as to whether he might be interested in serving as a class representative in the event an administrative claim proved unsuccessful. Id. Underwood responded in the affirmative and subsequently signed a Representation Agreement that, among other things, outlined the duties of a class representative. Id. and Underwood Representation Agreement (PX3). Cantarella prepared an administrative Claim for Underwood (doc 10-9), which Defendants denied (doc 10-10), and an administrative Appeal (doc 10-11), which Defendants also denied (doc 10-12). Cantarella Affidavit (PX2).

### B.   Post Complaint

On October 24, 2013, less than a week after Defendants denied Underwood's administrative Appeal, Class Counsel filed the putative Class Action Complaint (doc 1). Shortly thereafter, in an effort to locate more Class members so as to show "numerosity" for class certification, Class Counsel added information about the case to their law firm website and to the Facebook websites of the major unions they

believed sponsored the Plan, strategies that greatly increased the number of new calls about the DRB reduction under the Thirteenth Amendment.[3]  Time Records (PX1).

Defendants subsequently filed a motion to dismiss (doc 7), to which Class Counsel objected (doc 10) and moved for summary judgment (doc 11), and also moved to certify the class (doc 12).  The parties thereafter filed further responsive and reply briefs (docs 14, 15, 16, 18, and 19).

On May 6, 2014, the case was reassigned from Judge Zatkoff to Judge Michelson (doc 20).  The following day, the parties received instructions to provide a statement of the case to Judge Michelson (doc 21) and, thereafter, they participated in a telephonic status conference (doc 22).  A few weeks later, Class Counsel learned that an attorney representing a single individual, Roger Schleben, filed a complaint alleging the same Claim–months after Underwood filed the Class Action Complaint. Accordingly, Class Counsel filed a motion to consolidate the Schleben action with this case (doc 23) and, thereafter, a reply brief in further support of the motion (doc 24).  As a result, Judge Cohn reassigned the Schleben action to Judge Michelson where it became a companion case to this case, thereby accomplishing the primary objective of the consolidation motion: to ensure that the same Judge ruled on all claims like Underwood's so as to eliminate the possibility of inconsistent outcomes

---

[3]  This information included a statement that the then putative Class had not yet been certified by the Court.

(see again doc 23).  Therefore, Class Counsel subsequently withdrew the motion (doc 43).

On August 6, 2014, the Court scheduled a hearing for September 9, 2014 on the dispositive motions and the motion for class certification (doc 25).  A few days before the hearing, Underwood received a Notice from Defendants which, among other things, stated that, under the Plan, only those disability benefits not "in pay status" could be reduced (doc 26-1).   Because this information supported Underwood's argument that §10.4 of the Plan expressly prohibits Plan amendments that reduce the benefits [of any kind] of persons who are already receiving benefits, Class Counsel filed the Notice as supplemental support for Underwood's summary judgment motion (Id.).  Six days after the hearing, on September 15, 2014, the Court issued an Opinion and Order granting Underwood's motion to certify the class (doc 27), and a separate Opinion and Order granting summary judgment for Underwood on his legal theory that the Thirteenth Amendment, to the extent it reduced the DRB of persons already receiving the DRB, contravened the plain language of §10.4 and had to be read out of the Plan (doc 28 Pg 10 and Pgs 15-21, citing §10.4 and §10.11 of the Plan).

Two weeks later, on October 2, 2014, Class Counsel filed a motion for costs and attorneys' fees under ERISA §502(g)(1) and prejudgment interest (doc 31), and a motion for common fund fees and related expenses (doc 33), together with

numerous supporting exhibits to both motions. Pursuant to a stipulated order entered on November 6, 2014, Class Counsel subsequently withdrew both motions, except the request for prejudgment interest, on the understanding that they could re-file the cost and fee motions at a more appropriate time, as set forth in the order (doc 44). Thereafter, the parties filed additional briefs respecting Underwood's request for prejudgment interest (docs 47 and 49).

In the course of the attorney fee and prejudgment interest proceedings, (i) the Court ordered the parties to brief the issue of whether it possessed the authority to toll any deadline to appeal its September 15, 2014 order (doc 37); (ii) Class Counsel filed a proposed Class Notice (doc 38) and amended Class Notice (doc 45), mailed the latter to the Class (doc 48), and filed three separate reports with the Court regarding the results of the mailing (docs 48, 51 and 52); and (iii) the Court ordered Class damages discovery (doc 41), which was completed on February 27, 2015 (doc 50).

The Class damages discovery revealed that at least 39 Class members were effectively forced to convert their capped DRB to a reduced Early Retirement Benefit ("ERB) before age 62 to mitigate their immediate monthly DRB losses ("the Early Converts"), as the reduced ERB exceeded their capped DRB under the Thirteenth Amendment (see doc 53). Although providing some temporary relief to the Early Converts, this forced choice would ultimately cause the Early Converts to experience a significant lifetime loss of benefits because their reduced ERB would never pop-up

to the full <u>unreduced</u> ERB available to DRB recipients who simply wait until age 62 when their DRB <u>automatically</u> converts to the full unreduced ERB (<u>id</u>.).  Therefore, Class Counsel filed a motion for leave to amend the Complaint to add a Count II on behalf of the Early Converts (doc 53).  Defendants initially opposed the motion (doc 54), but later stipulated to its filing (doc 61), but only after (i) Class Counsel prepared and filed a reply brief in support of the motion to amend (doc 55) and a supplemental Affidavit from Cantarella with attached letters, emails and faxes from <u>thirty-five</u> of the Early Converts, attesting to the fact that they were forced to make the Hobson's choice of converting to the ERB before age 62 (doc 59); (ii) Class Counsel prepared for and participated in a hearing on the motion (3/26/15 minute entry); and (iii) the Court ordered the parties to non-binding mediation (doc 60).

### C.   Post Amended Complaint

Subsequently, Class Counsel filed the Amended Complaint (doc 62) and the parties participated in the Court-ordered mediation, which, while not resulting in a settlement (doc 65), likely planted the seeds for the settlement discussions that ultimately led to the Settlement Agreement in this case.  Following the mediation, the Court conducted a status conference (doc 67), during which Defendants disclosed that, a few weeks after the Court's September 15, 2014 rulings, they amended and restated the Plan ("the Restatement") such that §10.4 of the Plan read the way they *wished* it had read when the Court issued its earlier summary judgment rulings; that

is, that the §10.4 benefit promise applied solely to the "Accrued Benefit," and not to the DRB provided under Article V of the Plan, or any other benefit in pay status. Thereafter, the parties filed cross-motions for summary judgment respecting the Restatement (docs 69 and 70) and responsive and reply briefs (docs 73, 74, 75, 76).

### D.    Post Restatement Proceedings

On September 25, 2015, the Court granted Plaintiff's motion for summary judgment respecting the Restatement, relying on the identical reasoning employed by the Court in granting summary judgment to Plaintiffs in September of 2014 (doc 77). A few days later, the Court conducted a status conference (9/30/15 text only order), during which the parties agreed they would spend time trying to resolve some of the issues and, in the interim, Plaintiffs agreed to withdraw their motion for prejudgment interest, but reserved the right to re-file it at a later date (Stipulated Order, doc 80).

Class Counsel ultimately decided that, although Underwood had done a stellar job of representing the entire Class, an Early Convert Class member should be added to co-represent the Early Converts to allay any possible concern that Underwood could not adequately represent the Early Converts.  On November 20, 2015, after interviewing several Early Converts who had previously expressed interest in assisting with the litigation, Class Counsel filed an unopposed motion, which the Court granted, to appoint Early Convert Class member Donald E. Lee ("Lee") to

serve in this capacity, along with Lee's affidavit (docs 83 and 84).[4]   Shortly thereafter, Class Counsel participated in a telephonic status conference with the Court (12/1/15 minute entry), and prepared a proposed stipulated order setting dates for filing briefs respecting the remaining Count I damages issues (i.e., whether Defendants should pay to the Class statutory costs and fees and prejudgment interest), which order was entered on December 4, 2015 (doc 85).

A few weeks later, Class Counsel filed motions for prejudgment interest and attorneys' fees and costs under ERISA §502(g)(1) (docs 86 and 87), supporting briefs and, subsequently, reply briefs (docs 93 and 95).   On March 2, 2016, the Court awarded all of the costs and most of the fees Plaintiffs requested, and awarded interest at a 5.48% annualized rate, which was within the range of possible reasonable rates of interest (doc 97).

Class Counsel submitted a proposed Final Judgment on Count I of the Amended Complaint to which Defendants objected (doc 98), after which Class Counsel responded and submitted a new proposed Final Judgment (doc 100).   On June 8, 2016, the Court held a hearing on the proposed Final Judgment (minute entry 6/8/16) and, the following day, entered a Final Judgment on Count I of the Amended Complaint (doc 101).

---

[4]   Lee also signed a Representation Agreement similar to the one signed by Underwood wherein he agreed to abide by the duties of a Class representative.  See Lee Representation Agreement (PX4).

### E.    Post Final Judgment Proceedings

On June 23, 2016, Defendants filed a Notice of Appeal (doc 103) and a motion to stay execution on Count I without a supersedeas bond (doc 104).  Class Counsel filed a response and objections to the motion, along with supporting exhibits (doc 108).  On July 27, 2016, the Court entered an Order, requiring Defendants to post within thirty days a supersedeas bond in the amount of the Final Judgment to stay execution on the Final Judgment (doc 111).  Around this same time, the Sixth Circuit Court of Appeals ordered the parties to participate in non-binding mediation.  See Sixth Circuit Docket (PX5 at doc 10).  Because the mediation previously ordered by *this* Court did not result in a settlement, Class Counsel did not assume that the mediation ordered by *the Sixth Circuit* would necessarily fare any better.  Accordingly, Class Counsel immediately familiarized themselves with current Sixth Circuit rules and brief requirements, and commenced preparation of Plaintiffs-Appellees' appeal brief.  See Time Records (PX1).  In fact, the mediation ordered by the Sixth Circuit did not result in a settlement.  Sixth Circuit Docket (PX5 at doc 29).  However, it likely opened a path to the settlement discussions that resumed a few weeks later.

### F. Settlement Discussions During Pendency of Appeal

On or about August 24, 2016, Defendants' attorneys requested a thirty-day extension of the deadline to post the supersedeas bond, explaining they believed an opportunity existed to settle the case. Class Counsel granted this request, but continued working on Plaintiffs'-Appellees' appeal brief since their were no meaningful settlement negotiations underway or settlement offers from Defendants at that time. See Time Records (PX1). Two few weeks later, however, the parties commenced, in earnest, comprehensive and extensive negotiations to settle both Count I and Count II of the Amended Complaint. This entailed considerable time because (a) the various settlement proposals had to be discussed with Underwood and Lee, and Class Counsel also sought reaction and input from other Class members regarding the proposals, and (b) there were many moving damages components to consider which vastly complicated the tasks of (i) establishing the formulas for calculating damages in a way that would make all Class members whole to the same extent, and (ii) drafting the Settlement Agreement language for accomplishing this goal.

For example, some Class members have died in the course of this litigation. Their surviving spouse or estate should receive their date-of-death damages. Other Class members had their reduced DRB eliminated on August 1, 2014 when they were unable to obtain an SSDI award by that date. They will have a two-tiered damages

11

calculation–one for the period before the elimination, and one for the period after. Some Class members had their reduced DRB eliminated and later reinstated retroactive to the elimination date after they obtained an SSDI award.  Others who were old enough to convert their DRB to a reduced ERB before age 62 (i.e., the Early Converts) [must be at least age 55 to convert] did so in order to mitigate the financial loss from the cuts to their DRB.  A few of these Early Converts actually experienced and will continue to experience an *increase* in benefits [when comparing their reduced ERB to their original DRB amount] until age 62, but, like the other Early Converts, the price for this temporary increase is that their ERB will never pop-up the full unreduced ERB.  The Settlement Agreement corrects the latter problem, albeit with a delay to the pop-up to account for the fact that these few Early Converts have and will continue to receive *more* than the original DRB until age 62.  Settlement Agreement §7.2.3 (PX6).

Finally, some Class members have divorced, meaning part of their damages must be paid to an "alternate payee" pursuant to the terms of a Qualified Domestic Relations Order ("QDRO"), the ERISA vehicle for apportioning pension benefits when a participant divorces.  There are seven such Class members and their QDROs all apportion the benefits differently, meaning the QDRO issues also had to be considered in resolving the damages methodologies set forth in the Settlement Agreement.  Class Counsel assumed the laboring oar to prepare the Settlement

Agreement and all related filings.  <u>See</u> Time Records (PX1).

In short, what might facially initially look like a simple case is, in fact, very complex when one takes into account the many moving damages components that had to be considered in litigating this case and formulating the damages methodologies set forth in the Settlement Agreement necessary to make <u>all</u> Class members whole to the same extent.  It took considerable time, effort, and experience on the part of Class Counsel to ensure this outcome and to otherwise make certain that the Settlement Agreement was fair, reasonable, and adequate (the Rule 23(e)(2) standard).

### G.    Other Time and Effort by Class Counsel

As noted in Part II.A., as soon as Cantarella began receiving calls from the Class members about the reduction of the DRB, she set up a group mail to regularly update them about the status of her investigation of their legal rights vis-a-vis the Plan and the Trustees and, after filing the Complaint, the status of the litigation.  <u>See</u> Time Records (PX1); Cantarella Affidavit (PX2).  To date, 249 of the 325 Class members have provided Class Counsel with their email address and are on Cantarella's group mail.  Cantarella Affidavit (PX2).  As evidenced by the Time Records (PX1), the time expended keeping Class members informed has been considerable and ongoing.  <u>Id</u>.

Further, on July 26, 2016, Cantarella notified all Class members on her group mail list that Class Counsel would hold a Town Hall Q&A-style meeting regarding

the class action on August 2, 2016 in the large education room at the Oakland County Bar Association.  Cantarella Affidavit (PX2); Time Records (PX1).  Approximately 60 Class members attended the meeting, and all Class Counsel and both Class representatives participated [Underwood in person, and Lee by telephone because he resides in Florida].  Cantarella Affidavit (PX2).  The Class members who attended indicated that they were very appreciative of the opportunity to meet Class Counsel and to have their individualized questions and concerns addressed at the meeting.  Id.

Finally, as this Court will recall, Underwood brought his alternate theory of liability under ERISA §305(e)(8), which permits multiemployer plans in "critical status," like the Plan here, to reduce specified "adjustable benefits," but expressly excludes from the definition of adjustable benefits disability benefits "in pay status." 29 U.S.C. §305(e)(8).  Although the Court ruled that ERISA §305(e)(8) did not prohibit the DRB cuts (doc 28 Pg 15), two months later, Congress passed the Multiemployer Pension Reform Act of 2014 ("MPRA"),[5] which added a paragraph (9) to ERISA §305(e) [and corresponding Code §432(e)].  Paragraph 9 permits multiemployer plans in worse financial condition than the Plan–i.e., those in "critical and declining" status–to "suspend" benefits, but explicitly excepts from any suspension whatsoever "benefits based on disability."  29 U.S.C. §1085(9)(D)(iii).

---

[5] Division O of the Consolidated and Further Continuing Appropriations Act, Public Law No. 113-235 (128 Stat. 2130 (2014).

Paragraph (9) also directs Treasury to promulgate enforcing regulations ("TRs").  Id.

Cantarella sought to ensure that the eventual enforcing TRs would clarify that, regardless of their character, benefits based on disability may not be suspended. Cantarella Affidavit (PX2).  Accordingly, Cantarella expended considerable time and effort in the fall and winter of 2015 communicating with Treasury on this issue, including a trip to Washington DC in December of 2015 where she offered testimony to Treasury on that very issue.  Id. and Time Records.  The final enforcing TRs under Code §432(e)(9), published on April 28, 2016, apply equally to ERISA §305(e)(9)[6] and are replete with examples explaining that multiemployer plans in critical and declining status are prohibited from suspending any benefit "based on disability." See 26 CFR 1.432(e)(9)-1(d)(4) (entitled, "Disability-based limitation").

Although the MPRA amendments and enforcing TRs technically apply solely to ERISA §305(e)(9) and Code §432(e)(9), they suggest that Congress intended the same protections for the disabled in multiemployer plans better able to pay the disability benefits because their funded status, while critical, is not "declining"–an argument Class Counsel intended to embellish and exploit in the Sixth Circuit if this case had not settled.  Cantarella Affidavit (PX2).  But, even if this Court believes the Sixth Circuit would give little weight to the argument because the MPRA was not law

---

[6]  See Treasury Decision 9765 re applicability to ERISA §305.  T.D. 9765, 2016 IRB LEXIS 301, 2016-20 I.R.B. 813 (I.R.S. 2016).

when this Court issued its ERISA §305(e)(8) ruling, the point of this discussion is simply that, at every juncture of this litigation, Class Counsel spared no time, expense, or creative or other energies to ensure that Class members would be made much better off on account of their efforts. That outcome will soon become a reality.

## III. CLASS COUNSEL ARE ENTITLED TO ATTORNEYS' FEES FROM THE COMMON FUND

### A. The Common Fund Exception to the American Rule

Under the American Rule, parties generally bear their own costs in litigation. Chambers v. Nasco, Inc., 501 U.S. 32, 45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). Excluded from this Rule is the "common fund" exception which is based on "the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980). In Boeing, the Supreme Court held that, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Id. (emphasis added). And in Blum v. Stenson, 465 U.S. 886, 900 n.16, 104 S. Ct. 1541, 79 L. Ed 2d 891 (1984), the Supreme Court expressly held that, in common fund cases, "a reasonable fee is based on a percentage of the fund bestowed upon the class."[7]

---

[7] Although the vast majority of common fund decisions involve a *settlement* fund, in
(continued...)

**B.      In the Sixth Circuit, the District Court May Award Common Fund Fees Using an Enhanced Lodestar Method or the Percentage of the Fund Method, But the Trend Is the Percentage Method.**

In light of the holding in <u>Blum</u>, it is not surprising that the Sixth Circuit and nearly every district court common-fund decision in the Sixth Circuit after <u>Blum</u> have noted a trend towards using a percentage of the fund method to determine the reasonable attorney fee.  <u>See</u> <u>Rawlings v. Prudential-Bach Properties, Inc.</u>, 9 F.3d 513, 515 (6th Cir. 1993); and cases sited in subpart 1 below.  Indeed, LEXIS research reveals that the vast majority of common fund decisions in this Circuit over the past 10-15 years have awarded attorneys' fees based on the percentage method.  <u>See again</u> cases cited in subpart 1 below.  However, the percentage method is not required in the Sixth Circuit; rather, the touchstone for determining an appropriate fee is that it be reasonable "under the circumstances." <u>Rawlings</u> at 516.  Therefore, in determining a reasonable common-fund fee award, district courts may use either an enhanced lodestar method or the percentage method.  <u>Id</u>.  Each method has its pluses and minuses:

---

[7](...continued)

<u>Boeing</u> the Supreme Court made clear that the common fund doctrine applies equally to *judgment* funds.  In fact, the Court held that, notwithstanding that only 47% of the class members *claimed* their *judgment* benefit, the district court's award of attorneys' fee from the entire *judgment* fund was "a proper application of the common-fund doctrine."  444 U.S at 478-481.

The percentage of the fund method . . . is easy to calculate; it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which avoids protracted litigation.  However, a percentage award may also provide incentives to attorneys to settle for too low a recovery because an early settlement provides them with a larger fee in terms of the time invested.

The lodestar method's listing of hours spent and rates charged provides greater accountability.  In addition, enhancing the lodestar with a separate multiplier can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved.  The lodestar method also encourages lawyers to assess the marginal value of continuing work on the case, since the method is tied to hours and rates, and not simply a percentage of the resulting recovery.

However, the lodestar method has been criticized for being too time-consuming of scarce judicial resources. . . District courts must pore over time sheets, arrive at a reasonable hourly rate, and consider numerous factors in deciding whether to award a multiplier.  With the emphasis it places on the number of hours expended by counsel rather than the results obtained, it also provides incentives for overbilling and the avoidance of early settlement.

Id. (internal citations omitted).  Despite the varying approaches to determining a reasonable fee, "[e]mpirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."  4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions §14:6 at 551 (4th ed. 2002).

In determining the appropriate fee in cases where the attorneys' work has benefitted many individuals, the Sixth Circuit suggests consideration of the following factors:

(1) the value of the benefit rendered to the class;

(2) the value of the services on an hourly basis;

(3) whether the services were undertaken on a contingent fee basis;

(4) society's stake in rewarding attorneys who produce such benefits;

(5) the complexity of the litigation; and

(6) the professional standing and skill of counsel on both sides.

Ramey v. Cincinatti Enquirer, Inc., 508 F.2d 1188, 1196 (6th Cir. 1974) (citing Denney v. Phillips & Buttoroff Corp., 331 F.2d 249 (6th Cir. 1964), and other cases.). While many district courts in the Sixth Circuit cite Ramey as requiring analysis of all six factors, it is important to note that Ramey and Denney were shareholder derivative actions and did not produce an ascertainable cash fund out of which fees would be paid. Ramey, 508 F.2d at 1196 (noting that this was also the situation in Denney). Therefore, some of the Ramey factors may not be applicable in a given common fund case. Indeed, many common- fund fee decisions do not discuss the Ramey factors at all, or only address those Ramey factors they deem pertinent to determining a reasonable fee award. See cases cited in subparts 1 and 2 below. The Ramey factors are addressed in subpart 3 below.

### 1. Percentage cases in this Circuit

Common fund percentage awards in ERISA/pension class actions in this Circuit have generally ranged from 25%-33%, although there are a few outliers. See

Schumacher v. AK Steel Corp. Ret. Accum. Pension Plan, 995 F. Supp. 2d 835, 838 (S.D. Ohio 2014) (**ERISA** pension benefits) (approving $1,326,000 fee award, which equaled **30%** of the $4.42 million *judgment fund*, noting that the statutory fees previously awarded [$618,471.35] would "offset the total fee award dollar for dollar."); Griffin v. Flagstar Bancorp, Inc., No. 2:10-cv-10610, 2013 U.S. Dist. LEXIS 173702 *23 (E.D. Mich. Dec. 2, 2013) (awarded **30%** of $3 million settlement fund, noting that "**ERISA** actions typically award between 30% and 33% on a percentage of the fund fee calculation"); Shanehchian v. Macy's, Inc., No. 1:07-cv-00828, 2013 U.S. Dist. Ct. Motions LEXIS 35167 *8-10 (W.D. Ohio Feb. 28, 2013) (**ERISA** imprudent investment claims) (awarded 30% of $8.5 million settlement fund); In re Delphi Corp. Secs., Derivatives & "**ERISA**" Litig., 248 F.R.D. 483, 488-89, 502-03 (E.D. Mich. 2008) (noting that the **18% and 20%** fee requests were "more than reasonable" given that they were "**below the range** of percentage fee awards generally accepted in this District"; $105.1 million in cash plus $179 million in "Delphi Plan Currency," bringing the total "potential value" to $284.1 million ); In re Visteon Corp. **ERISA** Litig., No. 05-71205, 2007 U.S. Dist. LEXIS 96023 *8-9 (E.D. Mich. Mar. 9, 2007) (awarded **28%** of $7.6 million settlement fund); Clevenger v. Dillards, Inc., No. C-1-02-558, 2007 U.S. Dist. LEXIS 17464 *2 (S.D. Ohio Mar. 9, 2007) (awarded **29%** of settlement fund; **ERISA** pension benefits; settlement fund unstated); In re CMS Energy **ERISA** Litig., No. 02-72834, 2006 U.S.

Dist. LEXIS 55836 *10, (E.D. Mich. June 27, 2006) (awarded **28.50%** of $28 million

settlement fund); New Eng. Health Care Emples. **Pension** Fund v. Fruit of the Loom,

234 F.R.D. 627, 630 and 634 (W.D. Ky 2006) (awarded **25%** of two settlement funds

totaling $42.30 million; **ERISA** pension fund); In re Broadwing, Inc. **ERISA** Litig.,

252 F.R.D. 369, 380 (S.D. Ohio 2006) (awarded **23%** of $11 million settlement fund,

noting that it was "**well below** the percentage of the recovery approved in similar

cases") (emphasis added in all).

      In non-ERISA class actions in this Circuit, the percentages range from 10% to

over 38%, with most percentages hovering around 33%. See, e.g., Bowling v. Pfizer,

Inc., 102 F.3d 777, 780 (6th Cir. 1996) (affirmed a common fund award of only 10%

of a $102.5 million settlement fund, noting that the case had settled quickly and,

therefore, counsel's request for 20% of the $102.5 million settlement fund was

"excessive" given the economies of scale in a class action; defective heart valves);

and Worthington v. CDW Corp., No. C-1-03-649, 2006 U.S. Dist. LEXIS 32100 *22

(S.D. Ohio May 22, 2006) (awarded **38.33%** of $1.45 million settlement fund;

severance pay under WARN Act).[8]

---

[8]  See also Swigart v. Fifth Third Bank, No. 1:11-cv-88, 2014 U.S. Dist. LEXIS
94450 *19 (S.D. Ohio July 11, 2014) (awarded **33%** of $4 million settlement fund;
overtime pay under FLSA); Johnson v. Midwest Logistics Sys., No. 2:11-cv-1061,
2013 U.S. Dist. LEXIS 74201 *16 (S.D. Ohio May 24, 2013) (awarded **33%** of
$452,380 settlement fund; monies owed under Fair Credit Reporting Act); Coughlan
v. Sprint Communs. Co. L.P., No. 11-11563, 2012 U.S. Dist. LEXIS 163197, *1-2
(continued...)

## 2.    Lodestar cases in this Circuit

As noted, the vast majority of common fund fee decisions issued out of this Circuit the past 10-15 years have determined the fee award based on a percentage of the fund, rather than on an enhanced lodestar.  Indeed, when the enhanced lodestar *was* utilized, it was almost always for purposes of performing a cross check or to simply further rationalize the percentage awarded.  Employed in this manner, the lodestar multipliers vary greatly.  For example, in In re Cardinal Health Inc. Sec. Litigs., 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007), the district court awarded 18% of a $600 million settlement fund, noting that it represented a lodestar **multiplier of**

---

[8](...continued)

(E.D. Mich. Nov. 15, 2012) (awarded **18%** of $7,845,000 settlement fund, noting that it was below the range of percentages awarded in the Sixth Circuit; property rights dispute); Rotuna v. West Customer Mgmt. Group, LLC, No. 4:09-cv-1608, 2010 U.S. Dist. LEXIS 58912 *23-24 (N.D. Ohio, June 15, 2010) (awarded **33.33%** of settlement fund [amount unstated]); Stanley v. United States Steel Co., No. 04-74654, 2009 U.S. Dist. LEXIS 114065 *8-9 (E.D. Mich. Dec. 8, 2009) (awarded **30%** of $4.45 million settlement fund; environmental air pollution); In re DPL Inc. Sec. Litig., 307 F. Supp. 2d 947, 954 (S.D. Ohio Mar. 8, 2004) (reducing 35% request to **20%** of $110 million settlement fund, reasoning that class counsel had performed a relatively small amount of work before the settlement); Kogan v. AIMCO Fox Chase, L.P., No. 98-cv-73230, 193 F.R.D. 496, 504-505 (E.D. Mich. May 30, 2000) (awarded **31%** of $4 million settlement fund; real estate securities); In re Kmart Corp. Sec. Litig., No. 95-CV-75584, 1998 U.S. Dist. LEXIS 23092 *20 (E.D. Mich. Oct. 30, 1998) (awarded **20%** of $10.5 million settlement fund, noting that "the case was of relatively short duration and involved little litigation activity"; Kmart stock); In re Rio Hair Naturalizer Prods. Liab. Litig., MDL No. 1055, 1996 U.S. Dist. LEXIS 20440 *27 n.11 & *69 (E.D. Mich. Dec. 20, 1996) (awarded **20%** of $4.5 million settlement fund, noting that the acceptable range was 20-50%; product liability action).

**six**.  On the other hand, in the Rawlings securities litigation, the Sixth Circuit affirmed a common fund award based on a lodestar enhanced by a **multiplier of two**, reasoning that the case settled before any protracted litigation, and the amount recovered for the class was low relative to the losses suffered by the class members (only 21% of their damages after deducting for the award).  Rawlings, 9 F.3d at 517.

Other cases in this Circuit have awarded fees in common fund or common benefit cases using lodestar multipliers between 1.5 and 5.3 with most multipliers hovering around 3.0.  See, e.g., In re Prandin Direct Purchaser Antitrust Litig., No. 2:10-cv-12141, 2015 U.S. Dist. LEXIS 5964 *15 (E.D. Mich. Jan. 20, 2015) (**multiplier of 3.01**); City of Plantation Police Officers' Emples. Ret. Sys. v. Jeffries, 2:14-cv-1380, 2014 U.S. Dist. LEXIS 178280 *48 (S.D. Ohio Dec. 29, 2014) (**multiplier of 3.0**); Lowther v. AK Steel Corp., No. 1:11-cv-877, 2012 U.S. Dist. LEXIS 181476 *17 (S.D. Ohio Dec. 21, 2012) (**multiplier of 3.06**); Merkner v. AK Steel Corp.,  NO. 1:09-CV-423, 2011 U.S. Dist. LEXIS 157375 *18 (S.D. Ohio Jan. 10, 2011) (**multiplier of 5.3**); Bailey v. AK Steel Corp., No. 1:06-cv-468, 2008 U.S. Dist. LEXIS 18838 *8 (S.D. Ohio 2008) (**multiplier of 3.04**).[9]   And Professor

---

[9]  See also Manners v. American General Life Ins. Co., No. 3-98-0266, 1999 U.S. Dist. LEXIS 22880 *93 (M.D. Tenn. Aug. 10, 1999) (**multiplier of 3.80**); In re Revco Sec. Litig., No. 89-cv-593, 1992 U.S. Dist. LEXIS 7852 *19 (N.D. Ohio 1992) (**multiplier of 2.5**); Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 250 (S.D. Ohio 1991) (**multiplier of 2.4-2.6** is "reasonable and conservative"); Basile v. Merrill Lynch, Pierce, Fenner & Smith, 640 F. Supp. 697,

(continued...)

Newberg states that "Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied." Newberg on Class Actions §14:6.

The problem with attempting to extrapolate a reliable and appropriate lodestar multiplier for any given case from the cases purportedly employing an enhanced lodestar cross check is that such cases often do not state the attorneys' total hours and/or hourly rate. Clearly, possessing that information is crucial to accurately extrapolating the lodestar multiplier in a given case. For example, if a common fund fee request were 25% of a $4 million dollar settlement or judgment fund, and if the attorney's hourly rate were $500/hour and the attorney worked 1000 hours, the percentage fee would equal $1 million, and the fee under a lodestar *with a multiplier of 2* would also equal $1 million [($500/hour x 1000 hrs) x 2 = $1 million]. But suppose the attorney's hourly rate were $600. In that case, the lodestar multiplier would be 1.6667 [$1 million fee / $600,000 straight lodestar = 1.6667 multiplier]. Given that many cases purporting to perform a lodestar cross check do not state the hours and/or hourly rates on which the multiplier was determined, their reported lodestar multipliers are inherently unreliable.

Perhaps for that reason, as well as for the reasons stated in Rawlings (see quote

---

[9](...continued)
704, 706 (S.D. Ohio 1986) (**multiplier of 2.78**); In re Beverly Hills Fire Litig., 639 F. Supp. 915, 924 (E.D. Ky. 1986) (**multipliers of 1.5, 2, 2.5, 3.5, and 5**).

*supra*), many ERISA percentage fee decisions employ no lodestar cross check at all. See again Schumacher, 995 F. Supp. 2d at 838 (although class counsel requested that a lodestar multiplier be applied to their *statutory* fee request, the district court did not perform a lodestar cross check on the 30% common fund award); In re Visteon Corp. ERISA Litig., 2007 U.S. Dist. LEXIS 96023 *9 (no lodestar cross check on the 28% awarded); Clevenger, 2007 U.S. Dist. LEXIS 17464 *12 (no lodestar cross check on the 29% awarded); In re CMS Energy Litig., 2006 U.S. Dist. LEXIS 55836 *10 (no lodestar cross check on 28.5% awarded).

Other percentage fee cases report a low multiplier based on a very high hourly rate (either then or as adjusted to current hourly rates), which skews the multiplier. For example, in the 2013 Griffin decision, the district court awarded 30%, noting that it equated to a lodestar of 0.864! 2013 U.S. Dist. LEXIS 173702 *24. **But**, the district court noted that class counsels' lodestar equaled $1,042,188.90 based on nearly 1,500 hours, meaning that class counsels' hourly rate equaled nearly **$700** in 2013 when the fee award was issued [$1,042,188.90 / 1,500 hrs = $694.79/hour.]  If class counsels' hourly rate in Griffin had been $500, the lodestar would have equaled $750,000.  Applying that lodestar to the 30% award ($900,000) produces a multiplier of 1.20 [$900,000 / $750,000 = 1.20].  Griffin illustrates the inherent risk of relying on the multipliers reported in cases purporting to perform a lodestar cross check when the cases do not report the attorney's hours or hourly rate, or when they base the

multiplier on a very high hourly rate. That alone should be ample reason for this Court to eschew awarding fees in this case based on an enhanced lodestar methodology or lodestar cross check. An additional and very important reason for not awarding fees here based on an enhanced lodestar methodology is that there is considerably more work for Class Counsel to do before they have fulfilled their obligations to Class members (discussed in subpart 3 below), making it impossible to accurately calculate their lodestar at this time.

If the Court wishes to do a lodestar cross check, the chart below provides the unenhanced lodestar (i.e., lodestar without multiplier) based on (i) all time invested by Class Counsel and paralegals Lori Howes and Shelly Rayment through October 25, 2016 [includes time not allowed under ERISA's fee-shifting statute, such as initial investigatory time], and (ii) the reasonable hourly rates this Court recently determined for Class Counsel and their paralegals (doc 97 Pg 19):

| Attorney | Recorded Hours through 10/25/16 | Reasonable Hourly Rate Determined by the Court | Lodestar |
|---|---|---|---|
| Cantarella | 2175.00 | $475 | 1,033,125.00 |
| Geller | 670.30 | $475 | 318,392.50 |
| Schram | 118.30 | $475 | 56,192.50 |
| Rucker | 46.30 | $250 | 11,575.00 |
| Howes | 24.75 | $125 | 3,092.75 |
| Rayment | 0.80 | $125 | 100.00 |
| **Total** | 3,045.45 | 1,925 | 1,422,477.75 |

Multiplying the total lodestar above by 3.0 results in a fee of **$4,267,433.25**. However, this enhanced lodestar does not reflect the additional time Class Counsel will need to expend issuing the Notice to the Class about the proposed Settlement, preparing for and participating in the fairness hearing, and answering questions from Class members following preliminary approval of the Settlement Agreement (assuming the Court grants such approval). See Part V of the Class Notice (EX 2 to the Joint Motion for Preliminary Approval). Class Counsel estimate they will expend at least 200 hours on these tasks, and that most of this time will be expended by Cantarella, as she is the attorney who has been answering Class members' questions all along. When this minimum estimated additional time is multiplied by Cantarella's reasonable hourly rate, and then enhanced by a multiplier of 3.0, the resultant additional enhanced lodestar fee is $95,000. Thus, **the total enhanced lodestar fee is $4,362,433.25.**

### 3. The reasonable common fund fee here

As discussed in the preceding section, use of an enhanced lodestar is an inherently unreliable way of determining a reasonable common fund fee. Therefore, the percentage method should be used in this case. Although analysis of the applicable Ramey factors indicates that the reasonable percentage is 33.33%, Class Counsel seek only 28% of the common fund because, under Recital K of the Settlement Agreement (PX6), Defendants will pay $716,199 of their fees.

**1st Ramey factor: value of the benefits rendered to the Class.** Under the Settlement Agreement, Class members will receive (i) before age 62, the greater of the benefit they are currently receiving and 95% of the benefit they would receive if Defendants had not reduced their DRB under the Thirteenth Amendment, plus interest at a monthly rate that equates to a 2.74% annualized rate [reflects monthly compounding][10] on any past benefits owed (based on the difference between 95% of their original DRB amount and the amount they received after the Thirteenth Amendment); and (ii) at and after age 62, the full unreduced ERB under the Plan before the Thirteenth Amendment, except that there is a delayed post age-62 pop-up for a few Early Converts whose ERB exceeded their original DRB. Although their pop-up will be delayed, they will nonetheless be made whole to the same extent as all other Class members. See Settlement Agreement §7.2.3 (PX6). The Settlement Agreement also removes the SSDI eligibility requirement and restores to all Class members the trade-disabled eligibility criteria in the Plan before the Thirteenth Amendment. See Settlement Agreement, §7 (PX6). This Court would be hard-pressed to find a case where the settlement agreement confers upon the class members nearly all of the monetary benefits they would have received absent defendants'

---

[10]  The parties understand this to be the "stream of benefits" method of calculating prejudgment interest endorsed by the Sixth Circuit in Caffey v. Unum Life Ins. Co., 302 F.3d 576, 585 (6th Cir. 2002) (affirming district court's use of a method that "calculated the interest due on each monthly payment of disability benefits beginning with the date that each payment was due").

wrongdoing. The value of the benefits conferred here is substantial: $14,135,860 in past benefits as of December 1, 2016 and over $21 million in future benefits which Class members will enjoy for many years to come. See Affidavit of Diane M. Storm with attached damages summaries (PX7). Class Counsel seek a common fund fee of 28% of the past benefits owed, only, or $3,958,040.80 Class Counsel do not seek fees on any of the future benefits bestowed upon Class members under the Settlement Agreement. But, if those future damages *were* taken into account, the effective percentage to Class Counsel would be only 13.35% [$3,958,040.80 + $716,199 payable by Defendants = $4,674,239.80 total fees / $35,000,000 (approx. total past and future benefits) = 0.1335].

Finally, the Settlement Agreement resolves the Count II Claims of the Early Converts by making them whole to the same extent as all other Class members. See Settlement Agreement, §§7.2.2, 7.2.3 and 7.2.4 (PX6). Given that Count II has not been adjudicated, and that obtaining "appropriate equitable relief under ERISA §502(a)(3)" (the statute under which Count II was brought) is often impossible,[11] the result in this case is especially excellent for the Early Converts. In short, the Settlement Agreement produces extremely valuable benefits for all Class members.

---

[11] See, e.g., Montanile v. Bd of Trs. of the Nat'l Elevator Indus. Health Plan, 136 S. Ct. 651, 657-659; 193 L. Ed. 2d 556, 564-566 (2016) (discussing the limitations of "appropriate equitable relief" under ERISA §502(a)(3)); and Great-West Life & Annuity Ins. Co. V. Knudson, 534 U.S. 204, 209-221; 122 S. Ct. 708, 712-719 (2002) (same).

**2nd Ramey factor: value of the services on an hourly basis**.  As explained in the last paragraph of Part B. 2. above (just below the chart), Class Counsel still have much work to do before this case is fully resolved, making it impossible to accurately perform a lodestar or enhanced lodestar cross check.  [In Ramey, the lodestar *had* to be considered because the settlement in that case produced no cash fund out of which fees could be awarded on a percentage-of-the-fund basis.  Ramey, 508 F.2d at 1196.]

Moreover, because the Thirteenth Amendment severely curtailed Class members' financial resources, it is unlikely any of them would have been willing, or could have afforded, to pay *hourly* fees in the hopes that this case would be successful, as evidenced by the contingent fee agreement between Underwood and Class Counsel.  See Underwood Representation Agreement (PX3) (explaining, *inter alia*, that if there is a recovery accruing solely to Underwood, the fee will be 33.33%; and if there is a recovery accruing to the Class, Class Counsel may request a fee of up to 33.33% of that recovery).  See also Clevenger, 2007 U.S. Dist. LEXIS 17464 *9-10 (making this same point); and Schumacher, 995 F. Supp. 2d at 849-852 (considering only the 3rd Ramey factor, reasoning that"[t]he fee agreement entered into between Schumacher and Class Counsel is, in the Court's view, the best evidence of what any of the class members would reasonably have agreed to at the outset of this case in order to secure representation").  In short, the 2nd Ramey factor is inapplicable in determining the reasonable fee here.

**3rd <u>Ramey</u> factor: whether the services were undertaken on a contingent fee basis**.  The third <u>Ramey</u> factor takes into account the risk that attorneys will not recover any compensation for their work on the case.  Many courts consider this risk of non-recovery to be the most important factor–sometimes the only factor--in determining the reasonable common fund fee award.  <u>See again</u> <u>Clevenger</u>, 2007 U.S. Dist. LEXIS 17464 *9-10; and <u>Schumacher</u>, 995 F. Supp. 2d at 849-852.

As noted, Class Counsel agreed to accept representation on a purely contingent-fee basis.  Thereafter, Class Counsel spared no time or expense to provide top-flight prosecution of the Class members' Claims (<u>see again</u> History of the Case, above), all without any remuneration, but with the risk they might receive nothing for their time, efforts, and out-of-pocket expenditures.

Moreover, considerable work remains for Class Counsel in this case because (i) Class Counsel will undoubtedly be flooded by telephone calls and emails once Class members receive the Class Notice of the proposed Settlement, and (ii) if past experience is prologue, Class Counsel will continue to respond to calls about the case from Class members (or persons who believe they are Class members) for at least one year thereafter.

Given the myriad services performed to date and the additional services Class Counsel will provide in the future, and that there was a risk all along that Class Counsel might never be compensated for their time and efforts, the third <u>Ramey</u>

factor–whether the services were undertaken on a contingency basis–weighs in favor of a percentage award at the upper end of the range of common-fund percentage awards in ERISA class actions in this Circuit.

**4th Ramey factor: society's stake in rewarding attorneys who produce such benefits**.  Rewarding attorneys who litigate class claims to recover ERISA benefits serves an important societal interest because, absent their efforts and the pooling of claims, most class members would not be able to afford counsel to litigate their individual claim.  Indeed, they might not even know that such help is available save for the class notices they receive in the course of the litigation.  Recovering ERISA benefits wrongfully withheld means class members will be better able to stand on their feet financially and live without the stress caused by having the financial rug pulled out from under them (as opposed to defaulting on their financial obligations and becoming a burden on their friends, family, and communities when benefits owed are not paid).  It is beyond debate that there exists a strong societal interest in rewarding attorneys who produce these positive outcomes.

**5th Ramey factor: the complexity of the litigation**.  This litigation was complex, in part, because, *before* the litigation, Defendants represented in documents they distributed to the Class members that the Pension Protection Act of 2006, PL 109-280, ("PPA"), an Act that amended ERISA, "required" them to reduce the DRB under §5.1 of the Plan because the Plan was in "critical" funding status.  See docs 10-

6 and 10-7. Defendants appear to have made this representation because §10.4 of the Plan prohibits plan amendments that reduce the benefits [of any kind] of persons who are already receiving benefits "[u]nless required by law" (doc 10-2 §10.4). Defendants did not, at that time, identify the provision(s) of the PPA they contended "required" the reductions (see again docs 10-6 and 10-7) . This necessitated that Class Counsel, prior to agreeing to assist Underwood with an administrative Claim, review the entire PPA [a 457-page document if downloaded to pdf] to determine whether it, in fact, required the reductions (or whether this might be suggested by the PPA's legislative history). Class Counsel found only one section of the PPA addressing multiemployer plans in critical status, and that was §305, 29 U.S.C. §1085.

Even a cursory review of §305 reveals that it is a lengthy, highly technical, statute with numerous paragraphs, subparagraphs, subparts, and clauses, all of which became effective for Plan years beginning in 2008 or later. See PL 109-280 at §101(d) (re effective date of PPA). Therefore, in order to properly address Defendants' contention that this relatively new statute, for which little case law or regulatory guidance exists, "required" them to reduce the DRB, it was necessary for Class Counsel to become wholly familiar with the statute, its legislative history, and various defined and undefined terms therein. Class Counsel found that §305 nowhere "required" Defendants to reduce the DRB. On the contrary, as Defendants

themselves asserted in this litigation, §305 prohibits reducing disability "pension" benefits in pay status (doc 7, bottom of Pg 11, doc 15 Pg 9).

However, the parties disagreed as to whether the DRB *was* a disability *pension* or *retirement* benefit (as opposed to a non-retirement disability benefit), a disagreement that necessitated considerable comprehensive research by Class Counsel to determine whether any governing statute or regulation delineates the type(s) of disability benefits that are deemed a disability *pension* benefit or disability *retirement* benefit. Class Counsel found and cited in this litigation several Pension Benefit Guaranty Corporation ("PBGC") regulations which Underwood contended support the conclusion that the DRB *is* a pension benefit (doc 19 Pg 29; doc 19 Pg 9), and that, therefore, the DRB reductions were prohibited under §305. Although this Court found that §305 did not "prohibit" the DRB reductions (doc 28 Pg 15), it also concluded that §305 did not "require" the reductions (doc 28 Pg 21).

Aside from the complexities of ERISA, this case also required Class Counsel to draw upon their intimate familiarity with the intricacies and nuances of the statutes and regulations governing ERISA plans in order to (i) address an ERISA statute Defendants implied in the administrative proceedings, but did not specifically cite [see Initial Denial (doc 10-10 and Appeal (doc 10-11)], and Treasury Regulations (TRs) Defendants cited for the first time in this litigation (doc 7 Pg 9-10), and to (ii) further support Underwood's Claim (see doc 10 at Pg 24-28, discussing the implied

ERISA statute and TRs cited by Defendants). Gaining a comprehensive in-depth understanding of the many statutes and regulations governing ERISA plans, and the case law interpreting those statutes and regulations, is a goal that can only be accomplished after *years* of litigating ERISA claims. Further, this learning is a constant process because ERISA is amended every few years.

No less importantly, ERISA is loaded with procedural "land mines" that, if not carefully observed, could effectively "blow up" even the most meritorious ERISA claim. This includes determining the relevant ERISA remedial statute under which to bring the claim, as aptly discussed in the Court's Opinion and Order granting summary judgment for Underwood based on the terms of the Plan (doc 28 Pg 7-10).

Last, but not least, Defendants raised many objections to class certification, which further added to the complexities of this case. For example, Defendants argued that restoring the DRB for all Class members would "hurt" the Plan's funded status and put non-disability pension benefits at peril (doc 16 Pg 9). Rebutting this argument required Class Counsel to obtain the Plan's most recent and lengthy Form 5500 annual financial report, pore over the data therein, and then explain by reference to the pertinent data and lack of any evidence by Defendants, why Defendants' contention was implausible (doc 18 Pg 7). Because Defendants continued to assert this argument at various points in the litigation, Class Counsel ultimately hired actuary Diane M. Storm (Storm) to calculate the aggregate Class damages and its

impact on the Plan's funded status.  This required, as a preliminary matter, (i) providing Storm with myriad documents, including a copy of the Plan and amendments thereto, a copy of the Thirteenth Amendment, relevant financial reports on the Plan, the pertinent data for each Class member (e.g., date of birth; original DRB amount; reduced DRB amount; whether the Class member elected to convert to the ERB before age 62 and, if so, the amount of the ERB; etc, etc), and the principal briefs in this case so she would have a clear understanding of the Claims. <u>See</u> First Storm Affidavit (doc 74).

Storm determined that (i) even if the past benefit damages were paid with prejudgment interest *at a rate of 15%*, this would impact the Plan's funded status by less than 1/4 of one percent, (ii) although future benefit damages are not payable now, if they *were* paid now, that would impact the Plan's funded status by only 0.64%, and (iii) if both such damages were paid now, the total impact on the Plan's funded status would equal only 0.88%.  <u>See</u> First Storm Affidavit (doc 74-1 Pg 14).  In short, the impact of the Class members' Claims on the Plan's funded status was yet another complexity of this case Class Counsel had to comprehensively address, and this further weighs in favor of a fee percentage at the upper end of the range for common fund percentage awards in ERISA class actions in this Circuit.

**6th <u>Ramey</u> factor: the professional standing and skill of counsel on both sides.**  Class Counsel have vigorously and efficiently prosecuted Plaintiffs' Claims,

as initially demonstrated by the fact that they assembled and filed a well-pled putative

class action Complaint just one week after issuance of the Final Administrative

Denial on Underwood's Claim. <u>See</u> Final Denial, dated 10/17/2013 (doc 10-12) and

Complaint, filed 10/24/2013 (doc 1). Class Counsel previously prosecuted thirteen

class claims for pension benefits, all but one of which were governed by ERISA. <u>See</u>

Cantarella Affidavit (PX2); Affidavit of Bradley J. Schram ("Schram Affidavit")

(PX8); and Affidavit of Robert P. Geller ("Geller Affidavit") (PX9). In several of

these cases, the district courts commented extensively on the expertise of Class

Counsel in litigating class claims for ERISA benefits:

> The court [*27] also finds that Humphrey's counsel is a zealous and competent representative. Plaintiff's counsel in charge, Eva Cantarella ("Cantarella"), and her law firm, Hertz, Schram & Saretsky, P.C. ("HS&S") [now Hertz Schram PC], are very experienced ERISA class action litigators. See Crosby v. Bowater Inc. Retirement Plan for Salaried Employees of Great Northern Paper, Inc., 212 F.R.D. 350, 353-54 (W.D. Mich. 2002) (noting that HS&S is "nationally recognized for its plaintiff representation in ERISA and employee benefit cases" and finding its lawyers "to be a very experienced and capable advocates for the class"), rev'd. on other grounds, 382 F.3d 587 (6th Cir. 2004), cert denied, 544 U.S. 976, 125 S. Ct. 1844, 161 L. Ed. 2d 726 (2005). Cantarella, a partner at HS&S, has participated in ten pension plan class actions and has also successfully prosecuted non-class claims for ERISA benefits, including pension benefits. (See Cantarella Aff. PP 10-14, Doc. 44 Ex. D.) The other attorneys working on Humphrey's behalf are equally experienced and capable. (See Bradley Schram Aff., Doc. 44 Ex. B; Robert Geller Aff., Doc. 44, Ex. C.) Together they have relentlessly advocated on behalf of Humphrey and the putative class members. This effort is typified by the [*28] extensive and detailed briefing provided not only in this motion for class certification but also on Plaintiff's cross motion for summary judgment. (See generally Docs. 41-55, 59, 64, 68, & 84.) Moreover, Cantarella presented her case at the hearing on class

certification in a cogent and prepared manner. For these reasons, the court finds that Plaintiff's counsel and her firm are more than adequate to represent the class action.

Humphrey v. United Way, No. 05-0758, 2007 U.S. Dist. LEXIS 59557 *27-28 (S.D. Tex. Aug. 14, 2007). Indeed, in the past 20 years, Class Counsel have recovered over $100 million dollars in ERISA benefits for participants and their beneficiaries. See Cantarella Affidavit (PX2), Schram Affidavit (PX8); and Geller Affidavit (PX9).

Bradley J. Schram, the founding shareholder of Hertz Schram PC ("HSPC"), has practiced law for 40 years, and has substantial class action experience, including litigating class claims for ERISA benefits. Schram Affidavit (PX8). Robert P. Geller ("Geller"), also a shareholder at HSPC and supervisor of the firm's ERISA team, has practiced law for 34 years and has considerable experience litigating class claims for ERISA benefits. Geller Affidavit (PX9). Senior associate Daniel W. Rucker has provided considerable legal research assistance in this case. Rucker has practiced for 12 years, has prosecuted other complex claims, and, over the years, has provided extensive research assistance on various ERISA issues. Rucker Affidavit (PX10).

Cantarella, a partner, came to HSPC from a national law firm. Cantarella Affidavit (PX2). Cantarella is responsible for investigating and evaluating all benefit claims proffered to HSPC that arise under a pension plan and for recommending which ones should be prosecuted. Id. Cantarella is a recognized expert on pension plans, and has been a guest speaker/presenter on pension issues in a variety of fora,

including the Internal Revenue Service and Department of Treasury where she has given testimony on pension issues. Id. She has been solicited for comment on pension issues by our nation's legislators, employee and retiree organizations, and reporters, and she has been quoted on pension issues in numerous business and legal publications. Id. More recently, Cantarella received the 2016 Global Award in Pension Law from Finance Monthly (August 2016), and the 2016 Pension Lawyer of the Year, USA, Award from Lawyer Monthly (October 2016). Id. Based on the foregoing, there should be no doubt that Class Counsel have considerable professional skill and standing when it comes to litigating class claims for ERISA pension benefits.

Defendants' attorneys, the law firm of Novara Tesija PLLC ("NTP"), advertise that (i) NTP has been providing legal services and representation to single and multiemployer benefit plans for over 30 years; and (ii) its attorneys "stay on the cutting edge of developments in employee benefit, and related, laws," and are "prepared to assist plan trustees and administrators in any matter affecting the operation of private sector or public sector employee benefit plans." http://www.novaratesija.com/ NTP's website further reveals that representing single and multiemployer benefit plans is NTP's "key" practice area. Id. Perhaps not surprisingly, NTP demonstrated in this litigation that it is well-versed in ERISA procedural and remedial issues, as well as ERISA substantive statutes. NTP also

advanced numerous creative defenses, further demonstrating its ability to defend against ERISA benefit claims.   In short, Class Counsel encountered highly experienced ERISA defense counsel in prosecuting the Class members' Claims.

In determining the appropriate percentage fee here, Class Counsel reiterate that a substantial majority of the benefits bestowed upon the Class members by virtue of Class Counsel's efforts is their future benefit damages, a fact that renders this case unique among the vast majority of common fund fee decisions, as Class Counsel have not requested any portion of the Class members' future benefits.   To properly compensate Class Counsel under the applicable principles and guidelines articulated in the Sixth Circuit, an award of 33.33% of the common fund created by the past benefits recovered represents the reasonable fee in view of the substantial total benefits conferred upon Class members and the outstanding results achieved. HOWEVER, because Defendants have agreed to pay $716,199 of Class Counsel's fees, **Class Counsel seek only 28% of the past benefits that will be recovered under the Settlement Agreement.**   The past benefits that will be recovered as of December 1, 2016 will equal $14,135,860 [Storm Affidavit (PX7 at attached damages summaries)], which, at 28% of this amount, translates into a fee award of **$3,958,040.80.**   Along with the $716,199 that will be paid by Defendants, the total attorneys' fees that would be paid to Class Counsel (assuming a 12/1/16 distribution date for the past benefits) will equal s**$4,674,239.80**.   This amount represents 33.07%

of the total past benefits that will be recovered as of December 1, 2016, but only 13.35% of the total past and future benefits that would be recovered as of that date [$4,674,239.80 / $35,000,000 (approx. total past and future benefits) = 0.1335].

### 4.   Related costs

The propriety of awarding class counsel their out-of-pocket expenses from the common fund has long been recognized by courts in this Circuit.  See, e.g., Bowling, 102 F.3d at 779 (affirmed award of $476,938.06 in expenses); New Eng. Health Care Emples. Pension Fund, 234 F.R.D. at 635 ("In the New England action, Plaintiffs' counsel is awarded attorneys' fees in the amount of $ 5.8 million and expenses in the amount of $ 1,483,746.63.") (**ERISA** case); Griffin, No. 2:10-cv-10610, 2013 U.S. Dist. LEXIS 173702 *26 (awarded $62,473.72 in expenses) (**ERISA** case); In re Visteon Corp. **ERISA** Litig., No. 05-71205, 2007 U.S. Dist. LEXIS 96023 *9 (awarded $72,344.29 in costs and expenses); In re CMS Energy **ERISA** Litig., No. 02-72834, 2006 U.S. Dist. LEXIS 55836 *10 (awarded $424,268.35 in costs and expenses); In re Broadwing, Inc. **ERISA** Litig., 252 F.R.D. at 383 (awarded $99,801.35 in expenses).

Exclusive of actuarial fees, Class Counsel have incurred $23,819.06 in costs through October 25, 2016, including postage, filing and messenger delivery fees, parking, mileage at 0.45/mile, copy costs, mediation fees, and travel expenses to Washington DC (see pp13-16), all as documented in the Expense Records maintained

by the firm (PX11). The actuarial fees to date add another $8,000, and Class Counsel anticipate at least another $5,000 in actuarial fees between now and final approval of the Settlement Agreement because (i) they have not yet been invoiced for October actuarial services, which were considerable due to the settlement negotiations; and (ii) past damages continue to accrue until distributions are made and, therefore, the actuary will need to recalculate and update the past damages through the anticipated distribution date. Class Counsel will absorb the cost of mailing the Class of the proposed Settlement. Therefore, in addition to their attorney fee request, Class Counsel request an award of **$36,819.06** [$23,819.06 + $8,000 + $5,000 est. addn'l actuarial = $36,819.06) as reimbursement for costs and actuarial fees.

## IV.   UNDERWOOD AND LEE ARE ENTITLED TO INCENTIVE AWARDS

In the Sixth Circuit, class representatives are typically awarded incentive awards for their "extensive involvement" in the lawsuit. Hadix v. Johnson, 322 F.3d 895, 897 (6th Cir. 2003). Such awards encourage class members to become class representatives by rewarding them for their time and efforts on behalf of the other class members. Id. Therefore, payment of incentive awards to class representatives is a reasonable use of settlement funds. Moulton v. U.S. Steel Corp., 581 F.3d 344, 351 (6th Cir. 2009).

In ERISA class actions in this Circuit where the named plaintiffs are individuals (as opposed to organizations), incentive awards have ranged from $1,000

to $15,000, with $5,000 to $10,000 being the norm.  See Griffin, No. 2:10-cv-10610, 2013 U.S. Dist. LEXIS 173702 *2, 25 ($5,000 awarded to each of two named plaintiffs; $3 million settlement fund); Shanehchian, No. 1:07-cv-00828, 2013 U.S. Dist. Ct. Motions LEXIS 35167 *8-10 ($5,000 awarded to each of four lead plaintiffs, and $1,000 awarded to one other named plaintiff; $8.5 million settlement fund); Yost v. First Horizon Nat'l Corp., No. 2:08-02293, 2012 U.S. Dist. LEXIS 191009 *2 (W.D. Tenn. Sept. 13, 2012) ($7,500 awarded to each of four named plaintiffs; $1.8 million settlement fund); In re Delphi Corp. Secs., Derivatives & "ERISA" Litig., 248 F.R.D. at 507 ($5,000 awarded to each of six named plaintiffs; $47 million settlement fund); In re Broadwing, Inc. ERISA Litig., 252 F.R.D. at 380, 382 ($5,000 awarded to each of two named plaintiffs; $11 million settlement fund); In re CMS Energy ERISA Litig. No. 02-72834, 2006 U.S. Dist. LEXIS 55836 *3 ($15,000 awarded to each of three named plaintiffs; settlement fund unstated).

Incentive awards in other common benefit cases in this Circuit where the class representatives are individuals have also been in this same $5,000 to $10,000 range, with a few exceptions.[12]  On the other hand, in common benefit cases in this Circuit

---

[12]  See Whitlock v. FSL Mgmt., LLC, No. 3:10-cv-00562, 2016 U.S. Dist. LEXIS 170516 *30 (W.D. Ky Dec. 22, 2015) (wage and hour claims; incentive awards for each of six named plaintiffs ranging from $6,351 to $10,029; $1.040 million settlement fund); Halaburda v. Bauer Publ. Co., LP, No. 2:12-cv-12831, 2015 U.S. Dist. LEXIS 709 *10 (E.D. Mich. Jan. 6, 2015) (alleged unlawful disclosure of subscriber information) ($5,000 incentive award to named plaintiff; no indication of

(continued...)

where the class representative is an organization, incentive awards may exceed the $15,000 ceiling "because of the greater burden in the course of litigation by producing greater numbers of documents and participating in Rule 30(b)(6) depositions."[13] Here, Underwood and Lee deserve incentive awards at the upper end of the $1,000 to $15,000 range for individual class representatives in ERISA class actions in this Circuit, as both have far exceeded Class Counsel's expectations and have been exemplary in carrying out their duties as class representatives.

---

[12](...continued)
a settlement fund); Allan v. Realcomp II, Ltd. No. 10-cv-14046, 2014 U.S. Dist. LEXIS 185994 *2-3 (E.D. Mich. Sept. 4, 2014) (claims based on prior FTC restraint-of-trade ruling) ($5,000 incentive award for each of five named plaintiffs; $3.250 million settlement fund); Franklin v. Midland Funding, LLC, No. 3:10-cv-91, 2011 U.S. Dist. LEXIS 89919 *42-44 (W.D. Ohio Aug. 12, 2011) (Fair Debt Collection Act Claims) ($8,000 incentive award to named plaintiff; $5.2 million settlement fund); Worthington, No. C-1-03-649, 2006 U.S. Dist. LEXIS 32100 *14-16 (WARN Act claims) ($50,000 award to initial named plaintiff, and $10,000 award to each of two other named plaintiffs who joined the suit much later; $1.45 million settlement fund); Brotherton v. Cleveland, 141 F. Supp. 2d 907, 913-914 (S.D. Ohio 2001) (civil rights claims) ($50,000 awarded to named plaintiff; $5.2 million settlement fund); In re F&M Distribs., Inc. Sec. Litig., No. 95-cv-71778, 1999 U.S. Dist. LEXIS 11090 *21 (E.D. Mich. 1999) (securities claims) ($7,500 incentive award to each of two named plaintiffs; $20.25 million settlement fund).

[13] See Shane Group, Inc. v. Blue Cross Blue Shield of Mich., No. 10-cv-14360, 2015 U.S. Dist. LEXIS 41968 *56-57 (E.D. Mich. 2015) (awarding $20,000 to $45,000 to each of four organizations, and $5,000 to $10,000 to each of the individual class representatives); In re Skelaxin (Metaxalone) Antitrust Litig., No. 2:12-cv-83, MDL No. 2343, 2014 U.S. Dist. LEXIS 91661 *12 (E.D. Tenn. June 30, 2014) (awarded $50,000 to each of the four named plaintiffs, all of whom were organizations).

**A.     Proposed Incentive Award for Underwood: $15,000**

Underwood was one of the first Class members to contact Cantarella in June of 2013 about the Notice the Plan sent informing DRB recipients that their DRB would be slashed effective August 1, 2013.  Cantarella Affidavit (PX2).  Although Cantarella was preoccupied with other client matters and client commitments at that time, Underwood was persistent (and ultimately successful) in his efforts to convince Cantarella to move the DRB issue to the top of her docket and give the matter a thorough review.  Id.

Not long thereafter, Cantarella requested that Underwood obtain copies of the following documents: (i) the full formal Plan document and all of its amendments [there were thirteen amendments at that time]; (ii) the summary plan description (SPD); (iii) all Notices, memos, and letters about the Plan that Underwood received from the Plan Administrators in the preceding three years; and (iv) the report of the Independent Medical Examiner retained by the Trustees who determined Underwood was totally and permanently disabled from doing work in the construction industry. Id.  Underwood obtained all of these documents within just a few weeks, id., many of which were subsequently used in this litigation (see, e.g. docs 10-2 through 10-8).

After Cantarella reviewed these and other materials and concluded that Underwood had a valid Claim to have his DRB restored and his past DRB benefits paid, Underwood signed a Representation Agreement with Cantarella and her firm

wherein he agreed to (i) participate in administrative proceedings on his Claim and, if those proceedings proved unsuccessful, (ii) represent all other DRB recipients whose DRB was reduced under the Thirteenth Amendment, and in a manner consistent with the duties of a class representative. Cantarella Affidavit (PX2). Prior to this Agreement, Cantarella also interviewed other DRB recipients as possible class representatives, but most were fearful of potential reprisals by Defendants if they were a named plaintiff and/or were not otherwise as qualified as Underwood to assume class representative responsibilities. Id.

Throughout this litigation, Underwood has (i) read, and regularly communicated with Class Counsel about, the many filings in this case; (ii) brainstormed with Class Counsel ideas for prevailing on a number of the issues; (iii) promptly provided to Class Counsel documents he received from the Plan in the course of this litigation; and (iv) based on numerous conversations with Underwood, fielded myriad calls from other Class members. Cantarella Affidavit (PX2). Underwood also participated in the August 2, 2016 Town Hall meeting (discussed in the History of the Case above) and the subsequent discussions that lead to the settlement of this dispute (assuming the Court approves the Settlement Agreement). Id. and Time Records (PX1). Underwood has gone above and beyond the norm in fulfilling his duties to the Class. Id. Accordingly, he is entitled to an incentive award at the top end of the range of awards to individuals in ERISA class actions in this

Circuit.  Id.  Class Counsel propose that the Court award Underwood **$15,000** for his time and efforts on behalf of the Class.  Id.

### B.    Proposed Incentive Award for Lee: $7,500

Lee began regular communications with Cantarella early on in this dispute Cantarella Affidavit (PX2).  Despite his keen interest in pursuing a Claim against Defendants and willingness to serve in a representative capacity, Lee was initially ruled out as a potential class representative because Class Counsel knew of no other DRB recipient who, like Lee, converted their DRB to an ERB before age 62 (i.e., the Early Converts).  Id.  Things changed in January of 2015 when, as a result of Class damages discovery, Class Counsel learned there were 39 Early Converts [now 45]. Id.  Thereafter, Class Counsel filed an Amended Complaint, adding a Count II on behalf of the Early Converts (doc 62); and Lee was subsequently appointed to represent this subset of Class members (doc 83).

Both prior to his appointment and thereafter, Lee has regularly supplied Class Counsel with documents he has acquired about the Plan.  Cantarella Affidavit (PX2). While some were duplicative of documents supplied by Underwood, one particularly interesting document was not:  A DVD presentation about the Plan which makes it abundantly clear that the Plan Administrators considered the DRB to be a *pension* benefit, not a welfare benefit–a contested issued in this litigation.  Cantarella Affidavit (PX2).    The  entire  DVD  can  be  watched  and  heard  at:

http://mrcc.hertzschram.com/MRCC%20Full.html    The shorter snippet about the DRB being a pension is at:  http://mrcc.hertzschram.com/MRCC%20Short.html

Unfortunately, Lee was unable to locate the DVD until December of 2015 [Cantarella Affidavit (PX2)]--three months *after* the Court ruled that the DRB was a *welfare* benefit (doc 77 Pg 9).  Although the DVD information might not have convinced the Court otherwise, Lee's efforts in locating this document further demonstrate that both before and after his appointment as a co-class representative, Lee has actively strived to assist with the litigation; he has not been a passive class representative.  Cantarella Affidavit (PX2).  It is also evident from Class Counsel's many communications with Lee that he has read all of the principal filings in this case and understands the issues.  Id.

Further, on May 20, 2016, when the parties were still arguing about the terms of the proposed Final Judgment on Count I, Lee created a Facebook page to help disseminate information to Class members: www.facebook.com/ubcretireescrisis/ Cantarella Affidavit (PX2).  Lee has several times advised Cantarella that, since he created this Facebook page, he has exchanged numerous private posts with Class members requesting information about the case and, in turn, informed them about the subsequent (i) entry of the Final Judgment, (ii) appeal filed by Defendants, and (iii) settlement of the dispute (subject to this Court's approval).  Id.  If the Court preliminarily approves the Settlement Agreement, Class Counsel will, with this

Court's permission, post notice of such approval on Lee's Facebook page dedicated to this case, as well as on their own website; and will do the same as to any final approval of the Settlement Agreement.  Settlement Agreement §2.2.2.[14]

Finally, before Class Counsel filed their unopposed motion to appoint Lee to represent the Early Converts (doc 83), Cantarella interviewed five other potential candidates to determine who would be best suited for the job.  Cantarella Affidavit (PX2).  Lee came out on top for multiple reasons, including that (i) he had collected the most documents pertinent to the Plan and indicated a willingness to try to find more, (ii) unlike several of the other candidates who expressed fear of possible reprisal by Defendants if they served, Lee expressed no such fear, (iii) Lee indicated that he could travel if that became necessary (e.g., for a deposition), while several of the other candidates indicated that they might not be able to travel due to their poor health, and (iv) as noted, it was apparent to Cantarella that Lee had read all of the principal briefs in the case at that time and understood the issues.  Id.  For all of these reasons, Lee is entitled to an incentive award at the top end of the range of awards to individuals in ERISA class actions in this Circuit, albeit halved to account for the fact

---

[14]  With this Court's permission, the notices of preliminary and final approval will also be mailed by first class mail to those Class members for whom Class Counsel does *not* have an email address, and emailed to those Class members who *have* provided Class Counsel with their email address.  Settlement Agreement §2.2.2 (PX6).  To date, 249 of the 325 Class members have provided Class Counsel with their email address.

that he has served as a class representative for a shorter period than Underwood. Therefore, Class Counsel request an incentive award for Lee in the amount of **$7,500**.

## V.   CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Class Counsel request a fee award in the amount of 28% of the past benefits recovered for the Class, plus an award of $36,819.06 for actuarial fees and other unreimbursed expenses Class Counsel have advanced in this litigation.  Class Counsel also request incentive awards in the amount of $15,000 for Underwood and $7,500 for Lee.

Respectfully submitted November 3, 2016

/s/ Eva T. Cantarella
Eva T. Cantarella (P51917)
Robert P. Geller (P26337)
Bradley J. Schram (P34391)
Hertz, Schram PC
1760 S. Telegraph Rd., Ste. 300,
Bloomfield Hills, MI 48302
o.248-335-5000; f. 248-335-3346; ecantarella@hertzschram.com
*Attorneys for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2016, I served on the below counsel for Defendants (i) Motion for Common Fund Attorneys' Fees, Costs and Expenses, and Incentive Awards to the Named Plaintiffs, (ii) Brief in Support, along with Exhibit List and Exhibits, and (iii) this Certificate of Service, via the Court's ECM e-filing system.  I also uploaded to the Court a proposed Order via the Court's ECF Utilities functions and emailed the proposed Order to the below counsel for Defendants.

Edward J. Pasternak (P58766)
John I. Tesija (P36709)
Novara Tesija PLLC
2000 Town Center, Ste. 2370
Southfield, MI 48075
o. 248-354-0380; f. 248-354-0393
ejp@novaratesija.com
tesija@novaratesija.com
*Attorneys for Defendants*


/s/ Eva T. Cantarella_____
Eva T. Cantarella (P51917), ecantarella@hertzschram.com, *Attorney for the Class*

H0381232.1                                                                    51