UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS E. UNDERWOOD, individually
and on behalf of all others similarly situated,

     Plaintiff,

v.

CARPENTERS PENSION TRUST FUND—
DETROIT AND VICINITY, and TRUSTEES
OF CARPENTERS PENSION TRUST
FUND—DETROIT AND VICINITY,

     Defendants.

Case No. 13-cv-14464
Honorable Laurie J. Michelson

---

**OPINION AND ORDER APPROVING CLASS ACTION SETTLEMENT AND
GRANTING IN PART CLASS COUNSEL'S MOTION FOR COMMON FUND
ATTORNEYS' FEES, COSTS AND EXPENSES,
AND INCENTIVE AWARDS TO THE NAMED PLAINTIFFS [117]**

---

This ERISA class action is before the Court pursuant to Federal Rule of Civil Procedure

23 for final approval of a proposed class action settlement and for class counsel's motion for

attorneys' fees, costs and expenses, and incentive awards for the named plaintiffs (R. 117). The

Court has reviewed the many filings relevant to these determinations, including two objections

filed by unnamed class members, and the Court conducted a fairness hearing on February 15,

2017. For the reasons that follow, the Court will approve the settlement agreement and grant in

part the motion for attorneys' fees.

**I.**

**A.**

The Court has described the case's facts in detail in prior orders. But in short, the

Carpenters Pension Trust Fund—Detroit and Vicinity, a multiemployer benefits plan subject to

the Employee Retirement Income Security Act ("the Plan"), had an amendment procedure stating that "no amendment of this Plan shall be permitted to reduce . . . the benefits of any person who is already receiving benefits." In August 2013, the Plan's trustees amended the Plan, reducing the "disability retirement benefits" (DRB) that the class members had already started to receive. One of those DRB recipients, Thomas Underwood, sued, and the Court certified a class consisting of "[a]ll persons who commenced receiving disability benefits from Carpenters Pension Trust Fund—Detroit & Vicinity Pension Plan on or after September 1, 2008, and who were receiving those disability benefits on August 1, 2013." *See Underwood v. Carpenters Pension Trust Fund-Detroit & Vicinity*, No. 13-CV-14464, 2014 WL 4602974, *11 (E.D. Mich. Sept. 15, 2014). The Court also appointed Hertz Schram, P.C. as class counsel. *Id.*

In September 2014, the Court granted Underwood's motion for summary judgment, holding that to the extent that the August 2013 Amendment reduced the benefits that Underwood and other class members had already started to receive on the date the amendment became effective, it violated the Plan and was unenforceable. *Underwood v. Carpenters Pension Trust Fund--Detroit & Vicinity*, No. 13-CV-14464, 2014 WL 9866416, *13 (E.D. Mich. Sept. 15, 2014).

Nonetheless, after the Court's order, in October 2014, the trustees amended the Plan's amendment provision to permit the very type of amendment that the Court had just held to be unenforceable under the prior version of that provision: amendments that reduce the benefits of participants already receiving them. Defendants also backdated the October 2014 Amendment to apply prior to the August 2013 Amendment.

Later, in April 2015, Underwood filed an amended complaint adding a second count related to a group of individuals whom the Court will refer to as the "early converts." (R. 62.) By

way of background, the Plan allowed for certain participants to elect to receive a reduced "early retirement benefit" (ERB) in lieu of waiting for the full unreduced benefit available to them at age 62. (R. 62, PID 1419.) According to the amended complaint, because of the August 2013 Amendment's benefits reductions, some class members opted to take the reduced ERB early instead of continuing to receive their amendment-reduced DRB. (R. 62, PID 1420–21.) Count II of the amended complaint requests "appropriate equitable relief" under ERISA § 502(a)(3) to restore these class members to the positions they would have been in absent the amendments. The Court later granted an unopposed motion appointing Donald Lee as co-class representative to represent the early converts. (R. 84.)

The Court also allowed the parties to brief whether the October 2014 Amendment, like the prior August 2013 Amendment, violated the Plan's terms. And in September 2015, the Court held that it did, granting Underwood's motion for summary judgment. *See Underwood v. Carpenters Pension Trust Fund-Detroit & Vicinity*, No. 13-CV-14464, 2015 WL 5655838, *7 (E.D. Mich. Sept. 25, 2015). But this left Count II unresolved—including whether the subclass of early converts could prevail under their claim for equitable relief under ERISA § 502(a)(3).

Further developments happened after the Court's September 2015 opinion and order invalidating the October 2014 Amendment. In March 2016, the Court granted in part Underwood's request for an award of prejudgment interest and statutory attorneys' fees and costs under ERISA § 502(g)(1). *See Underwood v. Carpenters Pension Trust Fund—Detroit & Vicinity*, No. 13-CV-14464, 2016 WL 806707, at *1 (E.D. Mich. Mar. 2, 2016). On June 9, 2016, the Court entered final judgment on Count I, awarding the class $13,496,131.63, including past due DRB benefits, prejudgment interest, and costs and fees awarded under § 502(g)(1). (R. 101.) The parties filed cross notices of appeal shortly thereafter. (R. 103, 106.) While the parties

pursued their appeal, they reached a proposed settlement agreement, so the United States Court of Appeals for the Sixth Circuit remanded the case to this Court to conduct a fairness hearing regarding the proposed settlement under Federal Rule of Civil Procedure 23(e)(2). (R. 115.)

### B.

The following summarizes the settlement agreement's key terms. To start, several provisions are relevant to the class members' recovery. Section 6.1.1 of the agreement contemplates that the Plan will pay the class a sum of $14,135,860[1] for past damages. (R. 116-2, PID 2545.) This includes interest of 2.74% calculated on a "stream of benefits" basis. *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002) (endorsing that method for use in calculating prejudgment interest and describing it as "calculat[ing] the interest due on each monthly payment of disability benefits beginning with the date that each payment was due"). This sum does not include the restoration of future benefits, something covered by other provisions. Section 6.1.1 also provides that the Plan will pay class counsel a portion of class counsel's fees directly, $716,199. (R. 116-2, PID 2545–46.)

The circumstances of each class member dictate the specific relief provided under the agreement. Section 7.2.1 applies to the vast majority of class members—those who did not elect to convert their DRB to a reduced ERB before the age of 62. (*See* R. 116-2, PID 2547–48.) The agreement restores these class members to 95% of their DRB—both financially and in terms of the criteria for receiving DRB (*e.g.*, not having to prove disability to the Social Security Administration). This restoration applies retroactively to August 1, 2013 (when the August 2013 Amendment became effective) and going forward for each class member until age 62. At age 62, a class member's DRB will convert to a full unreduced ERB under the Plan's terms prior to

---

[1] This value is as of December 1, 2016 and has since increased, according to more recent filings that will be discussed later.

4

August 1, 2013 and continue at that level going forward. Any past benefits restored under this arrangement will accrue interest at 2.74% under a "stream of benefits" method of calculation and will be paid to each class member in a lump sum. The class's share of the attorneys' fees will reduce the lump sum for past benefits but will not affect future benefits.

The remaining provisions for relief apply to the "early converts"—those who elected to convert early to a reduced ERB in lieu of taking their reduced DRB under the August 2013 Amendment. Again, the early converts are the subject of Count II of the amended complaint, which remains unresolved.

Section 7.2.2 applies to class members who converted their DRB to an ERB before age 62 and whose current ERB is less than 95% of their original DRB. (R. 116-2, PID 2549.) These class members get a deal similar to non-early converts. For past benefits owed, they will receive a lump sum representing 95% of the difference between their reduced ERB and their original DRB (plus interest but less attorneys' fees). Going forward they will receive 95% of their original DRB benefit until the age of 62, at which point they will be eligible for unreduced ERB benefits.

Section 7.2.3 applies to the 12 class members who converted their DRB to a reduced ERB before age 62 but whose current reduced ERB is more than 95% of their original DRB. (R. 116-2, PID 2551.) These class members will return to DRB status at their current benefit level until age 62. Because they have received (and will continue to receive until age 62) a benefit reflecting more than 95% of their original DRB, they will repay the excess once they turn 62 via monthly credits to their ERB benefits. Once the excess is made up by these credits, their post-age-62 benefits will increase to their full unreduced ERB. Thus, like the other class members, they will be better off in the long run—again eligible for their full unreduced ERB going

5

forward. Moreover, to the extent any of these class members had a period of time before they converted their DRB to the reduced ERB, they will be entitled to a lump sum for that period, computed under Section 7.1.1.

Section 7.2.4 applies to the early converts who are now over the age of 62. (R. 116-2, PID 2552.) Their past benefits owed and future benefits will be calculated under Sections 7.2.1, 7.2.2, or 7.2.3, depending on which category they fall into, *i.e.*, whether and when they converted early to a reduced ERB, and whether their ERB is more or less than 95% of their original DRB.

Some other provisions are worth noting as well. For one, various sections operate to impose on class members a sweeping release of any and all claims against Defendants in any way related to the claims in this case (other than claims arising out of the settlement agreement). (*See* R. 116-2, Sec. 3.2–3.4.) Additionally, Section 9.1 provides that Defendants agree not to oppose any fee request or request for incentive awards made by class counsel. (R. 116-2, PID 2555.)

## C.

On December 22, 2016, the Court preliminarily approved the proposed class-action settlement. (R. 121.)

Class members were provided a detailed notice of the proposed settlement, which indicated that the proposed settlement would include a "lump sum payment to each Class member of 95% of all back benefits owed less the Class member's share of attorneys' fees, costs and expenses, and incentive awards to the Named Plaintiffs awarded by the Court." (R. 116-3, PID 2565.) The notice indicated that class counsel had requested fees in the amount of 28% of the past benefits common fund, costs and expenses in an amount less than $50,000, and incentive awards of $15,000 for Underwood and $7,500 for Lee. (*Id.*) The notice also explained the

6

release. (R. 116-3, PID 2565.) And it provided instructions for class members who wished to object. (R. 116-3, PID 2574.) Only two objections from class members followed. (R. 122, 123.)

The Court conducted a fairness hearing on February 15, 2017 and made findings that the settlement agreement was fair, reasonable and adequate. The Court also granted class-counsel's motion for attorneys' fees, costs and expenses, and granted in part incentive awards for Underwood and Lee (R. 117). This opinion memorializes the oral rulings.

## II.

The Court begins with approval of the settlement agreement. "[B]y way of background, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 309 (6th Cir. 2016) (internal quotation marks and citation omitted). As such, "there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.* This is "not an indictment of any parties or counsel in particular; it is merely a recognition of the adverse incentives at work in class-action settlements." *Id.* Thus, it is this Court's responsibility to "carefully scrutinize whether the named plaintiffs and counsel have met their fiduciary obligations to the class, and whether the settlement itself is 'fair, reasonable, and adequate.'" *Id.* (quoting Fed. R. Civ. P. 23(e)(2)).

"Several factors guide the inquiry: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497

F.3d 615, 631 (6th Cir. 2007) (citation omitted). Courts also consider other factors, including "whether the settlement gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) (internal quotation marks and citation omitted).

## A.

Starting with the first factor, the Court sees minimal risk of fraud or collusion. "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) (citing cases). Here, the Court is aware of no direct evidence of fraud or collusion. And the years of contested litigation and motion practice are strong evidence of the absence of fraud or collusion. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) (finding that the "duration and complexity of the litigation . . . undermine[d] the objectors' suspicions" of collusion because "[t]he parties litigated for almost four years before reaching a settlement agreement"). Class counsel's time records also reflect extensive negotiations leading up to the settlement. (*See* R. 117-2.) Still, the risk of collusion, even if remote here, warrants scrutiny of two provisions in the settlement agreement.

## 1.

The first provision at issue is Section 9.1 of the agreement, which states, "The Plan and the Trustees agree not to contest or take any position with respect to any such application [for attorneys' fees], which shall not be deemed as participating in the determination of the reasonableness of such fees or representing the Settlement Class with respect thereto." (R. 116-2, PID 2555.) To recap, the agreement provides that Defendants will pay class counsel a $716,199 slice of the fees directly, while each class members' lump sum payment for past due benefits will

be reduced by a proportional share of common fund attorneys' fees, which class counsel has requested at a level of 28%.

Defendants' agreement to not contest the fee request is akin to a "clear sailing" provision, one "where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 425 (6th Cir. 2012) (citation omitted).

Courts have recognized two dangers with clear sailing provisions: (1) "the likelihood that plaintiffs' counsel, in obtaining the defendant's agreement not to challenge a fee request within a stated ceiling, will bargain away something of value to the plaintiff class" and (2) "the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *See Gooch*, 672 F.3d at 425 (citations omitted). Thus, while "clear sailing provisions . . . have [n]ever been held to be unlawful *per se*, . . . courts have recognized that their inclusion gives the district court a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 291 (6th Cir. 2016) (internal quotation marks and citations omitted).

The Court finds no evidence of collusion in the inclusion of this provision here. It is hard to imagine what class counsel could have bargained away in exchange for this provision given the near-total relief the class will obtain. For the same reason, this is not a case where class counsel agreed to a low settlement amount in exchange for "red carpet treatment" on fees. Finally, even in the absence of the provision, Defendants would have no reason to contest the common fund fee award here, as the requested percentage-of-fund fee request has no impact on Defendants' total exposure under the agreement.

**2.**

The second provision that warrants consideration in connection with the danger of collusion is the release.

Under Section 3.1.1 of the agreement, the class members "absolutely and unconditionally" release Defendants "from all Claims . . . that Named Plaintiffs and/or the Settlement Class directly, indirectly, derivatively, or in any other capacity have or had . . . in consideration for the payment of the Class Settlement Amount, the sufficiency of which the Named Plaintiffs acknowledge." (R. 116-2, PID 2541.) The agreement defines "Claims" broadly, including:

> any and all claims of any nature whatsoever, including any statutory and common law claims, any and all losses, damages, attorneys' fees, disgorgement of fees, fines and penalties, and claims for contribution or indemnification, whether accrued or not, in law or equity, civil or criminal, seeking damages, attorneys' fees, litigation costs, injunctive, contractual, extra-contractual, declaratory or any other relief, or brought by way of demand, complaint, cross-claim, counterclaim, third-party claim or otherwise, arising out of or in any way related to any or all of the acts, omissions, facts, matters, transactions, or occurrences that are, were, or could have arisen out of or been related in any way directly or indirectly to all claims that were or could have been asserted in the Action.

(R. 116-2, Sec. 3.1.2.)

When the Court inquired about this provision at the December 21, 2016 hearing for preliminary approval, counsel for Defendants indicated that the release was intended to stave off other potential claims surrounding the DRB-reducing amendments, such as a breach of fiduciary duty claim under ERISA or a discrimination claim under the Americans with Disabilities Act. While the release is broad, it does appear to apply to claims with the same factual predicate as the one at issue here. *See Moulton*, 581 F.3d at 349 ("The question is not whether the definition of the claim in the complaint and the definition of the claim in the release overlap perfectly; it is whether the released claims share a 'factual predicate' with 'the claims pled in the complaint.'").

10

Moreover, Defendants' counsel represented that this release was a sticking point in the negotiation process—without it, Defendants would not have agreed to settlement. Because this is the only potential red flag that the Court sees in an agreement that is otherwise overwhelmingly favorable for the class, the Court the will "respect the parties' compromise and [will] not substitute [its] judgment for that of the litigants and their counsel." *See IUE-CWA*, 238 F.R.D. at 594 (internal quotation marks and citations omitted); *see also Robinson v. Shelby Cty. Bd. of Educ.*, 566 F.3d 642, 649 (6th Cir. 2009) (noting that in evaluating settlements, district judges "should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel").

Accordingly, the Court finds that the release does not undermine the settlement agreement's fairness, reasonableness, and adequacy.

\* \* \*

In short, the Court sees no evidence of fraud or collusion. The parties vigorously litigated this case for several years before reaching the settlement, which strongly suggests the absence of collusion or fraud. So this factor weighs in favor of approval.

**B.**

The Court next considers the complexity, expense, and likely duration of the litigation. To be sure, this case was complex. It entailed legal issues involving ERISA's intricacies, some of which are unsettled. This case was also expensive. It involved several thousand hours of work by class counsel, as evidenced by their submissions for statutory fees (*see* R. 87, R. 97) and for common fund fees (R. 117), which the Court will address in further detail below. And absent a settlement, this case is also likely to endure. It has been going on for several years. And it could drag on for several more: an appeal on Count I could take a year or more for a decision to be

11

handed down from the Sixth Circuit—which could result in a remand and further litigation on this Count—and Count II has not been litigated at all. *See Lasalle Town Houses Coop. Ass'n v. City of Detroit*, No. 4:12-CV-13747, 2016 WL 1223354, at *6 (E.D. Mich. Mar. 29, 2016) (noting that "[c]omplex litigation is both costly and time-consuming, and other class action cases in this district have spanned nearly a decade prior to appellate review"). The possibility of further delay is a special problem here: as class counsel has stressed throughout the litigation— something echoed by the class members who spoke at the fairness hearing—the benefits reductions have caused severe financial hardship to many class members.

Additionally, as the Court will discuss in further detail below, class members face not only the risk of prolonged litigation but also the risk that the Court's judgment in their favor on Count I will be overturned, meaning their benefits will never be restored at all. Indeed, "[w]hatever the relative merits of the parties' positions, there is no such thing as risk-free, expense-free litigation." *IUE-CWA*, 238 F.R.D. at 596. As for the early converts, they face the risk of never obtaining judgment in their favor to begin with.

Accordingly, the Court finds that this factor weighs in favor of approving the settlement.

### C.

The Court next considers the extent of discovery. "The relevant inquiry with respect to this factor is whether the plaintiff has obtained a sufficient understanding of the case to gauge the strengths and weaknesses of the claims and the adequacy of the settlement." *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 236 (E.D. Mich. 2016).

This factor strongly favors approval. The settlement came at a late stage in the litigation. An appeal was already pending on Count I of the amended complaint—after class certification, after formal discovery was completed, after two rounds of summary-judgment motions on Count

12

I, and after the Court entered final judgment on Count I. The parties have exchanged extensive discovery, which importantly includes discovery related to damages. This has enabled class counsel's actuary to calculate precisely the past and future damages. So the Court is satisfied that the parties have full knowledge of the underlying facts to reach an informed settlement.

**D.**

The Court turns next to the class's likelihood of success on the merits. "The fairness of each settlement turns in large part on the bona fides of the parties' legal dispute." *Int'l Union, UAW*, 497 F.3d at 631. Thus, the Court "cannot judge the fairness of a proposed compromise without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Id.* (internal quotation marks omitted). The Court "must specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why—given their likelihood of success on the merits—the tradeoff embodied in the settlement is fair to unnamed members of the class." *Shane Grp.*, 825 F.3d at 309.

A logical way to make this assessment is to compare the settlement recovery against the expected value of the class prevailing on appeal for Count I and on summary judgment or trial for Count II. *See* Newberg on Class Actions § 13:49 (5th ed.) ("if the class had a 10% chance of securing a $100,000,000 jury verdict, a $10,000,000 settlement would seem reasonable."). "Thus, the analysis can be broken down into four steps: (1) determining the amount of recovery under the settlement, (2) determining the amount of recovery assuming success at trial, (3) determining the likelihood of succeeding at trial [or on appeal], and (4) comparing the recovery under the settlement with the recovery a class member will receive at trial [or after successful appeal] discounted by the possibility that the class members will not prevail[.]" *Hillson v. Kelly Servs. Inc.*, No. 2:15-CV-10803, 2017 WL 279814, at *7 (E.D. Mich. Jan. 23, 2017).

Starting with step one, the recovery contemplated under the settlement is substantial. The bulk of the class—those who did not elect to convert early to a reduced ERB—will receive 95% of the past due DRB benefits they would have earned absent the amendment (less attorneys' fees and costs) and 95% of their future DRB benefits until they are eligible for an unreduced ERB at age 62. The recovery also puts the early converts in effectively the same place: they receive or are restored to 95% of the DRB they would have gotten but for the amendment (less fees and costs for past damages), and instead of getting a reduced ERB, they will be eligible for a full ERB. Thus the settlement gives the class members 95%—nearly all—of the benefits they would have received had the Plan never adopted the August 2013 Amendment.

Moving to step two, the Court acknowledges that the recovery could be *slightly* higher—100%—if the Court's judgment is affirmed on appeal for Count I and the early converts prevail on Count II.[2]

But, under step three, neither scenario would be a guarantee. On Count I, while this Court sided with the class, the Sixth Circuit could very well see things differently. For instance, in determining that the Plan's October 2014 amendment was impermissible, the Court addressed a novel question of law: "if an ERISA plan's amendment procedure expressly prohibits amendments that reduce benefits for anyone already receiving them, can the Trustees amend the amendment procedure to allow them to do just that—reduce the benefits of someone already receiving them?" *Underwood*, 2015 WL 5655838, at *4. The Court noted that it was "unaware of any authority that squarely addresses this issue." This alone creates a risk that the Court of Appeals could come out the other way.

---

[2] The Court acknowledges that recovery under the settlement is not really 95% given the common fund fee award. But the Court declines to take fees into consideration when making the comparison between the settlement and other possible outcomes because it is too speculative to say what any total fee award would be in the absence of settlement.

Moreover, the Court ultimately framed the issue as one of vesting, finding that the October 2014 Amendment was improper because DRB benefits vested under Section 10.4 of the Plan, which provided that "*no amendment of this Plan shall be permitted to reduce . . . the benefits of any person who is already receiving benefits on the date the benefit amendment is effective.*" But there is room for debate. As Defendants argued throughout this litigation, other provisions in the Plan expressly addressed "accrued" benefits of the sort that are undoubtedly of the vested variety. Moreover, ERISA law has been arguably moving in a direction that makes it more difficult to say that benefits vested. Indeed, recently the Supreme Court held that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life," invalidating the more beneficiary-favorable Sixth Circuit precedent to the contrary. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 937 (2015).

The early converts face even more uncertainty. Count II of the Amended Complaint requests the Court to provide "other appropriate equitable relief" under ERISA § 502(a)(3)(B) to restore the early converts to the position they would have been in absent the August 2013 Amendment—on the theory that the amendment coerced them into electing a reduced ERB. (*See* R. 62, PID 1421–23.) This theory has not been briefed. And the Court has doubts about its viability. Indeed, relief under § 502(a)(3) is limited. *See Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372–73 (6th Cir. 2015) (en banc) ("[T]he availability of relief under § 502(a)(3) is contingent on a showing that the claimant could not avail himself or herself of an adequate remedy pursuant to § 502(a)(1)(B)[.]"). And as class counsel points out, resolution of Count II may require deposing all 45 early converts to determine their motivations for converting to a reduced ERB—something that could delay the litigation and risk undermining the complaint's allegations of coercion. (R. 116, PID 2524.)

15

It is hard to say with any degree of precision what the chances are that judgment in the class's favor would be affirmed on appeal for Count I or that the early converts will prevail on Count II. But the Court can safely say that the risk of an unfavorable outcome for the class on either count is greater than five percent. In any case, the Court finds that a settlement that gives the class members the certainty of recovering 95% of the benefits they would have earned absent the events giving rise to this case is a fair tradeoff when faced with even a minimal possibility of receiving nothing. This tradeoff is especially fair here because the settlement gives immediate relief, something that has considerable value to the class. Without the settlement, when and if the class members' incomes would be restored would remain open questions for an unknown time to come. Thus, even if the class successfully appeals Count I and wins judgment in their favor on Count II, it would be difficult for many to continue to wait it out for those results. As class members stressed at the fairness hearing, the class has endured a tremendous amount of financial hardship and suffering as a result of their reduced benefits.

Accordingly, this factor weighs in favor of approving the settlement.

### E.

The Court next considers the opinions of class counsel and class representatives. "The judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight, and supports the fairness of the class settlement." *IUE-CWA*, 238 F.R.D. at 597 (internal quotation marks and citations omitted). The class here was represented by able counsel with many years of experience in successfully handling other ERISA class actions. (*See* R. 116, PID 2526.) Given this proven experience, the Court finds that class counsel's endorsement of the settlement—along with that of class representatives Thomas Underwood and Donald Lee, both of whom spoke at the fairness hearing—weighs in favor of approval.

16

**F.**

The Court next considers the reaction of absent class members.

As a preliminary matter, the Court notes that before a fairness hearing, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Such notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Int'l Union, UAW*, 497 F.3d at 629 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). After careful scrutiny of the proposed noticed, the Court approved the form and procedure used for notifying class members of the proposed settlement in its order preliminarily approving the settlement.[3] (R. 121, PID 3064.) After the notice was disseminated, two objections were filed.

"A certain number of . . . objections are to be expected in a class action." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003). "A court should not withhold approval of a settlement merely because some class members object." *IUE-CWA*, 238 F.R.D. at 600 (citation omitted).

The Court finds it significant that only two of 324 class members objected to the proposed settlement: "[t]hat the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'" *Cardizem*, 218 F.R.D. at 527.

---

[3] The Court notes that while the notice did not provide a renewed opportunity for class members to opt out, Federal Rule of Civil Procedure 23(e)(4) provides only that courts "*may* refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members," not that courts are "compelled to do so." *See Moulton*, 581 F.3d at 354.

17

What's more, the two objections focus almost entirely on the issue of attorneys' fees, not the settlement agreement itself. The two objectors—Jerome Powell and Charles Bean—raised mostly overlapping points, both in their written objections and at their appearances at the fairness hearing.

First, they object that their recovery will be reduced by legal fees. (R. 124-2, R. 124-3.) Each objector urges that Defendants should pay all of the fees. But it is well settled that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee *from the fund as a whole*." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (emphasis added). As the Court will discuss in further detail below, class counsel's fee request is fair and reasonable. Importantly, the bulk of the class's financial recovery is the restoration of their future benefits—something that the fee award does not even touch.

Second, the objectors also request—short of paying no fees—to have each class member pay a flat fee instead of a percentage. Contrary to the objectors' suggestions, the Court finds that it is much fairer to have each class member pay a proportional percentage of their recovery instead of a fixed rate.[4] Each class member's recovery is different depending on his circumstances, such as the monthly value of his full DRB benefit, the duration of the benefit, and whether an early reduced ERB election was made. So a flat fee could disproportionately hurt those class members whose circumstances do not lead to a significant recovery.

---

[4] The Court understands that a small portion of class members (less than a dozen) will not have any past damages and thus will not pay any share of fees. For instance, some of the early converts are receiving a benefit that is more than 95% of their original unreduced DRB. And some non-early converts are receiving a DRB that was already so low that it was not reduced by the August 2013 Amendment. While these class members will not pay fees, they will still be assessed for costs. The Court finds this to be fair and reasonable because, while these class members are still benefiting from the settlement, they stand to gain less than those who are recovering past damages.

18

Third, the objectors both contend that they were somehow mislead by class counsel into believing that the Defendants would be responsible for all of the fees. But the initial notice to the class says that class counsel would seek a fee equal to one-third of the "amount of any recovery obtained by the Class." (R. 124-4, PID 3101.) While this could have perhaps been phrased in a way that more explicitly indicated that the class, not the Defendants, would absorb the fees, the objectors have pointed to no specific evidence of why they were allegedly misled. And class counsel vehemently denies making any misleading statements about fees, which the Court finds credible. The misunderstanding perhaps stemmed from the Court's prior award of statutory fees under ERISA's "fee shifting" provision, § 502(g)(1). Under that award, the fees would have indeed been paid directly by Defendants to the class. But the settlement has changed the nature of the fees. As one Court has explained, when a settlement "extinguishe[s]" the liability a defendant may have had under a fee shifting statute such as § 502(g)(1), "the settlement converte[s] the . . . litigation into a common fund case, notwithstanding the fact that the causes of action arose under fee-shifting statutes." *McLendon v. Cont'l Grp., Inc.*, 872 F. Supp. 142, 152 (D.N.J. 1994).

At the fairness hearing, both objectors also took the position that the Defendants are not "giving anything up" under the settlement agreement. But they are. Defendants are required to make the class 95% whole. This places a much heavier burden on Defendants compared to the reduced benefits they have been paying since the August 2013 Amendment. Without the settlement, those reductions would continue to be imposed throughout the appeal and potentially indefinitely if this Court's judgment in the class's favor is reversed.

Additionally, Powell objects that class counsel extended the case by two or more years by adding Count II on behalf of the early converts. But Count I continued to be litigated while

Count II was pending, so this objection is based on a misunderstanding of how the case developed.

Finally, Bean objects that Defendants are not posting an appeal bond. (Prior to remand from the Court of Appeals, The Court entered a stipulated order extending the time for Defendants to post a supersedeas bond. (R. 112.)) But this has nothing to do with the settlement agreement.

In sum, based on these limited objections, the Court finds that the absent class members' reaction also weighs in favor of approval.

### G.

The Court next considers whether public interest favors settlement. It does, as "there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *Cardizem*, 218 F.R.D. at 530 (citation omitted). The Court can think of no countervailing public interest here. Thus, this factor weighs in favor of settlement as well.

### H.

Finally, the Court will consider whether "the named plaintiffs receive 'preferential treatment,' while the relief provided to the unnamed class members is 'perfunctory.'" *Vassalle*, 708 F.3d at 755 (citation omitted). Class counsel has asked for preferential treatment for the named plaintiffs in the form of incentive awards. Specifically, class counsel asks for an incentive award of $15,000 for Underwood and $7,500 for Lee. (R. 117, PID 2836–38.)

But class counsel's portrayal of the law surrounding this issue is not entirely accurate. Class counsel cites *Hadix v. Johnson*, 322 F.3d 895 (6th Cir. 2003) for the proposition that "[i]n the Sixth Circuit, class representatives are typically awarded incentive awards for their

20

'extensive involvement' in the lawsuit." (R. 117, PID 2833.) The Court made no such observation in *Hadix*. Instead, the *Hadix* Court declined to say when and whether incentive awards are proper because that was a case where an award would have been clearly improper. *See Hadix*, 322 F.3d at 898. And, post-*Hadix*, the Sixth Circuit has since noted that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013). Class counsel also cites *Hadix* for the proposition that incentive awards "encourage class members to become class representatives by rewarding them for their time and efforts on behalf of other class members." (R. 117, PID 2833.) But the Sixth Circuit has expressly rejected a similar reading of *Hadix*, noting "[n]othing in our opinion in *Hadix v. Johnson*, 322 F.3d 895 (6th Cir. 2003), adopts that proposition as our own." *Shane Grp.*, 825 F.3d at 311. Finally, class counsel cites *Moulton*, 581 F.3d at 351, for the proposition that "payment of incentive awards to class representatives is a reasonable use of settlement funds." (R.117, PID 2833.) But while that case apparently involved a $10,000 award to each class representative, the Court made no findings as to the propriety of those specific awards or incentive awards more generally. *See Moulton*, 581 F.3d at 351–52.

The reality is that the law in this Circuit surrounding incentive awards is far from as settled—or as favorable to class representatives—as class counsel makes it out to be. The propriety of an incentive award is a "difficult issue." *Hadix*, 322 F.3d at 898. As the Sixth Circuit recently reiterated, "[o]ur court has never approved the practice of incentive payments to class representatives, though in fairness we have not disapproved the practice either." *See Shane Grp., Inc.*, 825 F.3d at 311 (quoting *Dry Max*, 724 F.3d at 722). This reluctance to endorse such awards is well-grounded, as there is a "sensibl[e] fear that incentive awards may lead named

plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *See Hadix*, 322 F.3d at 897.

Accordingly, to ensure that requested incentive awards "are not in fact a bounty, . . . counsel must provide the district court with specific documentation—in the manner of attorney time sheets—of the time actually spent on the case by each recipient of an award." *Shane Grp., Inc.*, 825 F.3d at 311. "Otherwise the district court has no basis for knowing whether the awards are in fact 'a disincentive for the [named] class members to care about the adequacy of relief afforded unnamed class members[.]'" *Id.* (quoting *Dry Max*, 724 F.3d at 722 (emphasis in original)). Even when such documentation is provided, "[t]hat does not mean the court should necessarily approve the awards." *Shane Grp., Inc.*, 825 F.3d at 311.

Class counsel cites numerous district court cases illustrating that incentive awards to individual named plaintiffs in ERISA class actions have ranged from $1,000 to $15,000, "with $5,000 to $10,000 being the norm." (R. 117, PID 2834.) But not a single district court opinion relied on by class counsel appears to have considered any documentation of how much time the class representative actually spent on the case. And most of the cited awards appeared in orders with nothing but a conclusory ruling that the award was proper. *See*, *e.g. In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *3 (E.D. Mich. June 27, 2006) (approving incentive award in order and final judgment, without any citation to documentation or authority). Thus, class counsel's argument that Underwood and Lee are entitled to incentive awards "at the top end of the range of awards to individuals in ERISA class actions in this Circuit" is less than compelling, because that very range is suspect. (R. 117, PID 2837–41.)

Furthermore, class counsel has not persuaded the Court that Underwood and Lee are entitled to such high incentive awards because they have not submitted "specific

documentation—in the manner of attorney time sheets—of the time actually spent on the case by" the two class representatives. *See Shane Grp., Inc.*, 825 F.3d at 311. Even if such documentation was available, the representations that class counsel has made about the class representatives' roles in this case does not warrant entitlement to such a high award.

Underwood's role appears similar to what would be expected of any normal litigant. According to an affidavit provided by class counsel, Underwood persuaded class counsel to prioritize his potential claim. (R. 117-3, PID 2973.)  Underwood provided various documents that class counsel requested, such as the Plan document and its amendments and the independent medical examiner report specific to Underwood's disability determination. (R. 117-3, PID 2974.) Underwood signed a representation agreement with class counsel, under which he agreed to participate in the administrative proceedings specific to his own claim, and if unsuccessful, represent a putative class of other disability benefits recipients whose benefits had been reduced. (R. 117-3, PID 2974.) Underwood has also read the filings in this case, communicated with class counsel about the filings, "brainstormed" with class counsel about how to prevail on certain issues in the case, and has promptly provided class counsel with documents received from the Plan during the litigation. (R. 117-3, PID 2975.) As for his role beyond what one would expect from a normal litigant, class counsel suggests that "based on my numerous conversations with Underwood, [he] fielded myriad calls from other Class members." (R. 117-3, PID 2975.) He also participated in a question and answer session and later discussions that led to the proposed settlement. (R. 117-3, PID 2975.)

Lee's role has been less extensive than Underwood's. Lee was not appointed to represent the early converts until November 2015, over two years after the case began. (*See* R. 84.) Class counsel's affidavit maintains that Lee provided class counsel documents about the Plan (some of

23

which was duplicative with what Underwood provided). (R. 117-3, PID 2976.) Class counsel also believes that Lee has read the filings in this case and "understands the issues." (R. 117-3, PID 2977.) Furthermore, in May 2016, Lee created a Facebook page, purportedly to help disseminate information about the case's status. (R. 117-3, PID 2977.) But the Court reviewed the page in December 2016 (*available at* https://www.facebook.com/ubcretireescrisis/) and notes that the vast majority of posts appear to relate to the 2016 Presidential election and pension issues generally, not this case.

In the absence of any documentation of how much time Underwood and Lee spent on the case, the Court finds that they are not entitled to incentive awards as high as the ones they have requested. Still, the Court understands that they each spent significant time participating in the case by providing documentation, staying up to date on the filings in the case, and communicating with class counsel and class members. The Court appreciates that communicating with class members, and hearing and championing their stories of financial hardship and suffering, was a heavy burden for Underwood and Lee. Their work should not go unrewarded. *See Coulter-Owens v. Rodale, Inc.*, No. 14-12688, 2016 WL 5476490, at *7 (E.D. Mich. Sept. 29, 2016) (awarding reduced incentive award due to lack of documentation). Thus, the Court finds that Underwood is entitled to an incentive award of $5,000, and Lee is entitled to an incentive award of $2,500. While this is slightly preferential treatment for the class representatives, an award here does not call into question the fairness of the overall settlement because the relief provided to the unnamed class members here is substantial. In other words, this is not a case where the class representatives get thousands of dollars when the unnamed class members get something only nominal.

* * *

24

In conclusion, for the reasons discussed, the Court finds that the settlement agreement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2). Thus, the agreement will be approved.

## III.

The Court turns next to the issue of attorneys' fees. Class counsel asks the Court to award common fund fees at a level of 28% of the common fund for past damages. An additional sum will be paid directly by Defendants pursuant to the settlement agreement. The Court finds that this award fairly compensates class counsel.

"When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). The Sixth Circuit has cautioned that "[t]hese two measures of the fairness of an attorney's award—work done and results achieved—can be in tension with each other." *See Gascho*, 822 F.3d at 279. Accordingly, the Court has said that "[t]he lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Rawlings*, 9 F.3d at 516. The Court is permitted to select the "more appropriate method for calculating attorney's fees in light of the unique characteristics" of this case. *Id*. Courts often, "but by no means invariably," use various factors to guide the determination of the fairness of an attorneys' fee award:

> (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Moulton*, 581 F.3d at 352 (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)). In this case, the Court agrees with class counsel that the percentage of fund method is appropriate and that 28% fairly compensates class counsel.

## A.

Starting with the first factor, class counsel has obtained significant value for the class. The requested percentage-of-fund award appropriately compensates class counsel for obtaining such a result and is consistent with the "reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery." *Rawlings,* 9 F.3d at 516.

The class will receive nearly all of the benefits they would have received if the Defendants had never made the August 2013 Amendment that started this litigation and the October 2014 Amendment that prolonged it. To reiterate, the settlement will make the class members 95% whole. The class will also receive interest at a rate of 2.74 percent on past benefits owed. Based on the latest actuarial figures submitted by class counsel, past damages through March 1, 2017—the date through which the settlement agreement contemplates back benefits will be restored—amount to $15,153,176. (R. 124, PID 3083.) Twenty-eight percent of that value is $4,242,889.28. But importantly, class counsel does not request a fee that touches the future damages that class members earn after March 1, 2017, a sum that currently has a present value of $24,393,894. (R. 124, PID 3084.) Thus, the percentage-of-fund award of $4,242,889.28—even along with the $719,199 that will be paid directly by Defendants—really amounts to only around 12.55% of the over $39 million total recovery of past and future damages.

This award is well within reason, as fee awards routinely involve a similar or even greater share of the common fund. *See Gooch*, 672 F.3d at 426 ("The 'majority of common fund

26

fee awards fall between 20% and 30% of the fund.'"); *In re Packaged Ice Antitrust Litig.*, No. 08–MDL–01952, 2011 WL 6209188, *19 (E.D.Mich. Dec. 13, 2011) ("Importantly, the requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions.").

## B.

As for the second factor, a lodestar crosscheck reinforces the conclusion that the requested reward is reasonable in light of the value of the services class counsel performed. *See In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007) ("[M]ost courts adopting the percentage approach conduct a 'lodestar cross-check' to prevent counsel from receiving a windfall.").

The lodestar is calculated by multiplying a "reasonable hourly rate by the proven number of hours reasonably expended on the case by counsel." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). The Court notes that this method of calculating a fee award "has been criticized for being too time-consuming of scarce judicial resources." *Rawlings*, 9 F.3d at 516. That criticism would be appropriate here because of the over three-thousand hours of work performed by class counsel, as documented in the over one-hundred pages of time sheets submitted. (*See* R. 117-2.)

The Court previously addressed at length the value of class counsel's services when considering Underwood's motion for attorneys' fees under ERISA § 502(g)(1). In in its opinion and order, the Court made extensive findings as to the "reasonable hourly rates" for class counsel's services. *See Underwood*, 2016 WL 806707, at *8. Based on those rates, class counsel

has submitted documentation reflecting that the updated lodestar is equal to $1,527,599.[5] (R. 117, PID 2817; R. 125, PID 3106.) This value includes the many additional hours class counsel has worked since the calculations put before the Court leading to the March 2016 statutory fee award, including the work performed on the settlement after class counsel filed its fee request in November 2016, and a modest amount of additional time expected to be spent on the case to finalize it. (*See* R. 125, PID 3107–08.)

Obviously this projected lodestar of $1,527,599 is much smaller than the value of the percentage-of-fund fee request of $4,242,889.28. But in complex class actions like this one, courts routinely apply lodestar multipliers to determine the final award. As the Sixth Circuit has recognized, "enhancing the lodestar with a separate multiplier can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved." *Rawlings*, 9 F.3d at 516. The Court believes that a case of this sort would justify a multiplier of at least three, which is well within the normal range. *See In re Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-CV-12141-AC-DAS, 2015 WL 1396473, at *4 (E.D. Mich. Jan. 20, 2015) (finding multiplier of 3.01 to be "reasonable in light of what has been routinely accepted as fair and reasonable in complex matters"); *see also Cardinal Health*, 528 F.Supp.2d at 767–78 ("Most courts agree that the typical lodestar multiplier" in a large class action "ranges from 1.3 to 4.5"). Applying a multiplier of three yields an enhanced lodestar of $4,582,797.00. Thus, the requested fee of $4,242,889.28 comes in lower than the enhanced

---

[5] When the Court calculated the lodestar for purposes of class counsel's statutory fee request, the Court imposed a 20% across the board reduction because of block billing in the time records, billed time for administrative tasks, and primarily, because the factors for awarding statutory fees under ERISA were particularly strong only for the period of litigation that was brought about by Defendants' October 2014 Amendment. *Underwood*, 2016 WL 806707, at *11. Different factors and considerations are at play when it comes to a common fund fee award, so the Court does not find it necessary to impose a 20% reduction to the lodestar at this stage. Instead, as discussed, a multiplier would be more appropriate.

lodestar, reinforcing the conclusion that the requested fee is reasonable. Even adding the $716,199 in fees that will come directly from Defendants rather than from the common fund, the total fees roughly check out against the enhanced lodestar, coming in only around 8% higher.

As a final point for this factor, the Court notes that the interaction between the first and second factors is important here: the value of the benefit rendered to the class and the value of class counsel's services on an hourly basis. Again, the class members will recover 95% of their benefits. And that resulted from years of litigation and several thousand hours of work by class counsel. Thus, the common tension between the amount of work done and the results achieved is absent from this case, as both are substantial. This reality also eliminates the principal disadvantage of a percentage award, namely that such an award "may . . . provide incentives to attorneys to settle for too low a recovery because an early settlement provides them with a larger fee in terms of the time invested." *Rawlings*, 9 F.3d at 516. No such danger exists here. The settlement was by no means early and the recovery by no means low.

Thus, this factor supports the requested 28% percentage-of-fund award.

## C.

As for the third factor, it is significant that class counsel took this case solely on a contingent fee basis. Specifically, counsel's arrangement with Underwood provided that counsel would be entitled to 33 and 1/3 percent of his recovery. (R. 117-4, PID 2983.) Nonetheless, class counsel has performed several thousand hours of service on the case to date, with some yet to come. Furthermore, class counsel requests from the common fund only 28%, not the full 33% percent initially contemplated. Section 6.1.1 of the settlement agreement makes up the difference: the Defendants will pay class counsel $716,199, representing roughly 5% of the common fund for past damages. (R. 117-7, PID 3006.) Again, while the total award is somewhat

29

higher than what an award under an enhanced lodestar would reflect, the Court finds that this additional value is a fair means of compensating for the risk that class counsel took in spending thousands of hours and several years litigating this case with the very real possibility of getting nothing whatsoever.

### D.

Moving to the next factor, "In evaluating the reasonableness of a fee request, the court also must consider society's stake in rewarding attorneys who produce a common benefit for class members in order to maintain an incentive to others." *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 503 (E.D. Mich. 2008); *see also Cardizem*, 218 F.R.D. at 534 ("Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions like this benefits society."). Many class members have suffered significant financial hardships following their benefits reductions. Class counsel took a major risk to fight on their behalf and successfully obtained a settlement that makes the class members 95% whole. There is an important societal stake in rewarding such advocacy. Thus, this factor supports the requested award.

### E.

That this case was complex also favors the requested award. The case involved several thorny issues, including whether the Pension Protection Act required (or prohibited) the Plan amendments at issue, and whether, after the Court ruled against Defendants and found the August 2013 Amendment to be impermissible, Defendants were allowed to effectively circumvent this Court by enacting a retroactive amendment to the Plan's amendment procedure. The many and voluminous briefs and opinions and orders that this case has generated speak for

themselves when it comes to the complexity. Thus, this factor weighs in favor of the requested fee award.

## F.

The final factor weighs in favor of the requested fee award as well. Class counsel vigorously and zealously prosecuted the class's claim against Defendants. The affidavits submitted by the attorneys reflect their decades of experience in litigating ERISA class actions and obtaining favorable results for their clients. The law firm representing Defendants has also demonstrated its knowledge of ERISA and ability to litigate effectively for a struggling pension plan.

* * *

In conclusion, the Court finds that the requested percentage-of-fund award of 28% of the common fund fairly compensates class counsel for their work on this case.

## IV.

The Court next addresses class counsel's request for costs. "Under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation-related expenses." *Cardizem,* 218 F.R.D. at 535.

Class counsel has requested reimbursement of $37,607.12[6] for costs and expenses including fees for postage, filing, delivery, parking, mileage, copies, mediation, travel, and actuarial services. (R. 117, PID 2833; R. 125-2, PID 3114.) These expenses are well-

---

[6] This includes a $445.52 expense for Lee to travel to the fairness hearing. Class counsel provided the Court with documentation for that expense at the hearing.

documented, and the Court finds them to be fair and reasonable, so the Court will grant class counsel's request.

**V.**

For the reasons discussed, the class action settlement is APPROVED, and class counsel's Motion for Common Fund Attorneys' Fees, Costs and Expenses, and Incentive Awards to the Named Plaintiffs' (R. 117) is GRANTED IN PART. Class counsel is AWARDED $4,242,889.28 in attorneys' fees and $37,607.12 in costs and expenses. Class representative Underwood is AWARDED an incentive fee of $5,000.00, and class representative Lee is AWARDED an incentive fee of $2,500.00.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: February 17, 2017            U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 17, 2017.

s/Keisha Jackson
Case Manager